COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Appellee,

v.

**Morris C. HURD, Appellant.**

No. 85–585.

Supreme Court of Iowa.

Oct. 16, 1985.

Rehearing Denied Nov. 14, 1985.

---

Frank A. Comito and Patrick W. O'Bryan, Des Moines, and Hedo M. Zacherle, Des Moines, for appellee.

Morris C. Hurd, Ida Grove, pro se.

LARSON, Justice.

Morris C. Hurd, respondent, has appealed a ruling of the grievance commission which recommended suspension of his license. Hurd does not challenge the sufficiency of the evidence to support the ruling. He does challenge several procedural rulings of the commission on the ground they deprived him of his constitutional due process rights. On appeal, we find no merit in his procedural arguments and conclude misconduct by the respondent calls for revocation of his license.

## I. *The Procedural Objections.*

■ An attorney is entitled to the due process protections of the United States and Iowa Constitutions. *Committee on Professional Ethics and Conduct v. Hurd,* 360 N.W.2d 96, 100 (Iowa 1984). Many of Hurd's procedural complaints stem from his underlying premise that attorney disciplinary proceedings are "quasi-criminal" in nature. We have addressed that argument, however, and rejected it. *Id.* We need not discuss it further here. Nevertheless, we address his arguments in the context of the due process rights to which he is entitled as an attorney.

■ A. *The Discovery Issues.* The respondent first complains that the commission erred in ordering his oral deposition. In the deposition, however, Hurd asserted his fifth amendment right and gave only his name and address. Under these circumstances, we are at a loss to see how he could have suffered any prejudice.

■ Along a similar line, there was a request for admissions filed by the committee under Iowa Rule of Civil Procedure 127 (Court Rule 118.6 makes the discovery provisions of the rules of civil procedure applicable to disciplinary proceedings). Hurd filed objections to the request but has never answered it. Again, we can see no basis upon which he can claim prejudice. We reject this argument as well.

■ B. *The Continuance Issue.* About December 19, 1984, Hurd filed a motion to continue the disciplinary hearing, which was then set for January 9, 1985. At the same time, he filed a motion to permit John Stevens Berry, his counsel, to withdraw. The commission authorized Berry to withdraw, and on January 3, 1985, the hearing was reset for 9 a.m. on February 18, 1985.

On February 6, 1985, Hurd filed several papers, including a request for public hearing, a waiver of his "right to speedy trial," and an application for attorney Berry to be appointed at public expense. At that time, he also filed a motion for a second continuance. The commission, noting that the hearing was already set for the courtroom in the Ida County Courthouse, stated it would necessarily be a "public" hearing and apparently deemed it unnecessary to specifically address Hurd's request to make it public. In the same order, the commission denied the motion for continuance and denied Hurd's application for appointment of counsel.

■ On appeal, Hurd claims error only with respect to the commission's failure to grant the second continuance. This court has often stressed the necessity for prompt disposition of attorney disciplinary matters, and Hurd had already been granted a lengthy continuance. Under these circumstances, it was not an abuse of discretion to refuse his second request. Nor was it a denial of due process. Hurd had adequate time to secure representation and to prepare his response to the complaint.

■ C. *Hurd's Discovery Requests.* Hurd filed a motion for production of documents, requesting a broad range of information, including the right to inspect and copy all materials which the committee intended to use at the hearing. He also asked to "inspect and copy or photograph any reports and investigation reports," and "all minutes of meetings of the Grievance Commission and of Complainant Committee on Professional Ethics, and motions and resolutions adopted by such groups, as they pertain to Morris C. Hurd [and] that he be given a copy of all record made as it pertains to him and which is required to be a part of the permanent files of the Iowa State Bar Association...." In addition, he requested that the complainant furnish him "all documents, reports, statements, or any other material that tends to show that Morris C. Hurd did not commit the acts alleged or are otherwise exculpatory in nature" and "all documents, reports, letters, statements or any other materials that show or tend to show what investigation was made by Complainant and what knowledge Complainant has concerning payments of money [in an unrelated matter pending in district court]."

The committee's response stated it would make all exhibits available to Hurd prior to the hearing. As to the broad request to open its files, it asserted confidentiality of that information under the committee's rule 2.1(d), which provides that

> any such [disciplinary] files, *except for the work product of staff counsel or investigators* of the committee, shall be open to the inspection of the lawyer complained against. [Emphasis added.]

We addressed a similar request by Hurd in a prior case and noted the desirability of confidentiality in order to assure a free flow of information in connection with the complaint. *Hurd,* 360 N.W.2d at 100. We also observed that even in a criminal case a defendant ordinarily does not have a due process right to examine investigative files. *Id.*

We believe the confidentiality provision was properly raised by the committee and

that Hurd was not entitled to a fishing expedition in its files. We find no merit in this argument.

■ D. *The Place of Hearing.* Finally, Hurd complains that the change of the hearing site prejudiced him in his defense. The hearing was set for 9 a.m. on February 18, 1985, in the Ida County Courthouse. On the Friday before the hearing, the district court administrator notified the president of the grievance commission that the courtroom would be unavailable on February 18 because a jury trial would still be in progress. She reported, however, that she had made arrangements to hold the hearing in the city council chambers in the Ida Grove City Hall.

Hurd was immediately notified by telephone of the change but would not agree to the new location. A written order changing the place of hearing was prepared by the commission. Two copies of the order were sent to Hurd, one by certified mail with return receipt requested, and the other by ordinary mail. The ordinary-mail envelope was not returned to the commission. However, the envelope sent by certified mail was unclaimed by the respondent and, on March 27, 1985, it was returned to the grievance commission. We believe it is clear that Hurd was aware of the hearing site, both by telephone and by written order.

The evidence also showed that the clerk of the district court of Ida County posted a notice of the change of the hearing site in the city hall. Photographs, showing the posted notice, were admitted into evidence at the commission hearing.

Hurd objected to the change of hearing site, arguing he was entitled to ten days written notice of the change (without citing any authority), and asserting he had subpoenaed witnesses who would be unable to appear if the hearing site were changed.

The commission noted that several of the subpoenaed witnesses appeared at the city hall, either in person or by attorneys who filed motions to quash subpoenas. The witnesses and attorneys indicated they had no

difficulty in locating the hearing. The commission also noted that Hurd's office was located only one-half block from the city hall and approximately four blocks from the courthouse.

We agree with the commission that Hurd has shown no prejudice as a result of the change of the hearing site.

## II. *The Grievance Charges.*

The grievance complaint against Hurd alleged deceit of the court and opposing counsel in connection with three separate proceedings: an estate administration, a visitation hearing in a dissolution case, and a summary judgment hearing.

A. *The Koons Estate.* William Koons died on August 11, 1975, and his estate was probated in Ida County District Court. Hurd was named executor and served as attorney for the estate.

Several years after the estate was opened, the district court held a hearing on objections to Hurd's administration filed by the beneficiaries in the estate. Judge Dewie Gaul presided. The court concluded that several incidents of mishandling of the estate had been committed by Hurd and expressly found that he had lied in connection with one of the matters involved. The court ordered Hurd's removal as executor and attorney and ordered that he reimburse the estate for expenses.

The court's express finding of falsification by Hurd concerned his statements to an attorney as to the date he had filed the inheritance tax return. Some background is necessary to understand this issue. The decedent's two children, sole beneficiaries of his estate, became upset with Hurd's alleged mismanagement of the estate and decided to retain an independent lawyer to represent them. They hired Laurel Boerner of Ida Grove. When Boerner pressed Hurd to complete the estate proceedings, Hurd sent him a sheet of paper on which were reproduced two receipts for inheritance tax payments, one receipt dated December 14, 1978, and the other dated December 9, 1979. On the bottom of the page, Hurd wrote this note to Boerner:

I don [sic] not think that I will ever understand why it took so long to get this inheritance tax acquittance.

I filed the return within the statutory time limit, but I could not get the acquittance until now.

As you can see, I got a receipt of partial payment in December, 1978, and last Friday, I had to go to Des Moines personally to get the receipt showing full payment.

I believe that I am finally in a position to close the estate. I am preparing the final report now.

This note was discussed by Judge Gaul in the estate hearing:

Exhibit U shows a note signed by the executor and stating "I filed the return within the statutory time limit...." This statement the evidence shows is false. The return was filed at least ten months after the statutory time limit and apparently about 22 months after that limit, and no part of the tax due was paid until over two years after the statutory time limit. By reason of this failure to timely pay, for which no excuse was offered in evidence, the estate was assessed $156.60 in interest.

The grievance commission reached the same conclusion. We believe the commission's finding is supported by a convincing preponderance of the evidence.

B. *The Visitation Hearing.* Hurd represented a father in a child visitation matter arising out of a dissolution case. For purposes of confidentiality, we will refer to this father as Mr. W. *See* Iowa Code § 235A.14–.18 (1985) (requiring confidentiality of information in child abuse cases). Mr. W. was the subject of an investigation for sexual abuse of a child by a prior marriage. At the time of this investigation, an issue of child visitation in the dissolution action was pending before Judge Richard Vipond. Attorney David Blair, representing Mrs. W., had heard about the investigation and requested a hearing to discuss its impact on the visitation issue.

The commission ruling sets out its findings on this charge:

1. The portions of the hearing concerning this matter were held in closed session. The full names of the litigants in this matter, involving visitation following a dissolution decree, will not be set out in full.

2. A dissolution of marriage decree had been entered but visitation had not been permanently determined. The parties had entered into a voluntary temporary agreement in which Mr. W. was allowed daytime visitation with [the] children of the parties for approximately a six-month period of time. The period of time by which the temporary agreement (approved by the court) was to be permanent was rapidly approaching. The respondent represented Mr. W., and David Blair, an attorney of Sioux City, represented Mrs. W. There had been no nighttime visitation before the matter set out herein.

3. In April, 1983, Mrs. W. was contacted by a representative of the Department of Social Services of the State of Iowa who advised her that there was an ongoing investigation by the Department of Mr. W. and a son concerning alleged sexual abuse of a child of the parties. Mrs. W. had not filed the complaint.

4. Mrs. W. disclosed this information to her lawyer, Mr. Blair. Mr. Blair, quite understandably, felt this was information that was of the type which should be brought to the attention of the presiding judge before any permanent visitation should be determined.

5. At a pretrial conference held May 5, 1983 at the Ida County courthouse, Mr. Blair (representing Mrs. W.), the respondent (representing Mr. W.), and Judge Richard Vipond were present. Neither Mr. W. nor Mrs. W. was present. At that time Mr. Blair, in the presence of Judge Vipond and the respondent, stated that his client had reported she had been notified by the Department of Social Services of the State of Iowa that there was an ongoing sexual abuse investigation with respect to Mr. W. and a son. The respondent stated this was a fabrication either of Mrs. W. or Mr. Blair and he professed having no knowledge of this claim. The judge concluded that the matter could not be disposed of by agreement so the matter came on for hearing the next day at the Ida County courthouse, May 6, 1983.

6. The very next day, at a May 6th hearing, Mr. W. not only admitted that there was an ongoing investigation by the Department of Social Welfare of him and a son concerning possible sex abuse, but he also stated that he had so advised the respondent approximately one week before the May 6th hearing at a meeting with the respondent which took about an hour. It is clear that the respondent, when he professed ignorance to Judge Vipond and Mr. Blair on May 5, 1983, of the matter of the sexual abuse investigation of his client and son, full well knew of this fact. At no time during the May 6, 1983 hearing did the respondent deny [he had] knowledge of this fact for approximately one week.

In a case involving issues of custody or visitation, a court needs the wisdom of Solomon. It does not need half-truths and lies, yet these were Hurd's contributions to the hearing.

The testimony of Hurd's own client, both before Judge Vipond at the visitation hearing and at the hearing before the commission, established that Hurd had lied at the district court hearing. According to the client, he not only discussed the sex abuse investigation with Hurd before the hearing but in fact they had discussed it "in detail." And, when Hurd was confronted by his client's testimony at the visitation hearing, he offered no explanation. Attorney Blair, in his testimony before the commission, said "there's no question" that Hurd knew of the investigation of his client at the time of the visitation hearing.

We agree with the commission's finding on this specification.

C. *The Summary Judgment Hearing.* On February 18, 1981, Hurd commenced a

foreclosure action as attorney for Donald and Carol Aspedon. G. Kent Renegar of the law firm of Boerner & Renegar filed an appearance for the First State Bank of Ida Grove, one of the defendants.

During the pendency of the foreclosure proceedings, Hurd moved for summary judgment and sent notices to the adverse parties, including the bank. The Boerner law firm of Ida Grove still represented the bank. Edward Jacobsen, one of the firm members, was preparing to represent the bank at the summary judgment hearing.

On the morning of the hearing, which was set for 1:30 p.m., Jacobsen was at the Ida County Courthouse waiting to see the presiding judge. Hurd was there. Jacobsen asked Hurd about the upcoming hearing and whether there would be a "stipulated judgment of some kind." Hurd informed Jacobsen that he had received a release of the bank's claim to the property and suggested the bank would have no further interest in the matter.

Jacobsen was surprised by this development; his client had not told him that Hurd had contacted the bank or that it had released its claim. Jacobsen called the bank, and one of the officers confirmed what Hurd had said. The bank, at Hurd's request, had in fact sent to him a quitclaim deed, or release, of its interest. (It is not clear whether the document was a release or a quitclaim deed. The witnesses referred to it both ways, and the original had been "lost" in the meantime, according to Hurd.)

At the summary judgment hearing, Jacobsen immediately bore in on the circumstances of his client's "release." How, when the Boerner law firm had been in the case from the beginning, did Hurd get a release of the bank's interest without their knowledge? The following exchange occurred:

> JACOBSEN: I want to inquire of Mr. Hurd on the record if he has [the release] and if he does, I want the court to order him to produce it so that we can see if in fact my clients have released their claims here.

And, secondly, I'd like to inquire what the circumstances of any releases that were signed, and the circumstances surrounding the signing of those releases might have been.

> THE COURT: Do you have anything further?

> JACOBSEN: No I don't.

> THE COURT: Mr. Hurd, do you have any reply or response that you wish to make to the statement made by Mr. Jacobsen?

> HURD: I have no releases from either First State Bank or from United Builders that I know of in my file or with me or in my office.

> JACOBSEN: Why did you tell me this morning that First State Bank quitclaimed their interest?

> HURD: I had it in my mind that they did last fall. That just sticks with my memory. You know, I do lots of transactions every day and somehow I just have it in the back of my mind that we got some sort of a quitclaim deed from First State Bank, which surprised me when it came in the mail, but I don't see it in my file at the present time.

Hurd later testified:

> I remember getting it in the mail, but I don't see it in my file today. I remember how surprised I was when the deed came in the mail, but for some reason it's not here in my file. As I look at my file today, it's not there, and I think it should be. But I think that a summary judgment would be just as good as a quitclaim deed. I think we're entitled to a summary judgment.

At a later point, this statement was made by Hurd:

> In response to that [question about the release] I will say that I have gone through my files several times today and I do not see the quitclaim deed from First State Bank. It's very likely that that deed is lost and that in all probability I will never be able to produce it.

After the summary judgment hearing, Jacobsen again talked to the bank officers.

He found that two of them had previously talked to Hurd on the telephone regarding the release. They told him that, when the bank had not responded by releasing their interest, Hurd wrote a letter to them. One of the officers had also talked to Hurd in person, about the release, on the day the release was delivered to Hurd.

After the summary judgment hearing, the bank furnished Jacobsen with a copy of this letter from Hurd which said in part:

> You might or might not have a right to redeem the property from tax sale pursuant to Chapter 447 of the Code of Iowa. However, you would have to spend more than $841.00 plus interest and penalties and filing fees in order to redeem the property from the tax sale. I would not think that you have enough interest in that real estate to warrant your additional expenditure in that amount.
>
> I am trying to perfect title for Don Aspedon so that he can take charge of the property and do something sensible with it.
>
> I wish you would communicate with this office and assist me in making title for Don Aspedon.
>
> The house that sits on the real estate is falling into shambles. Trees are growing out of the foundation. Structural damage is going to occur if we don't do something about it. The neighbors bitterly complain to the City Counsel when the lawn is not cared for.
>
> Please contact me as soon as you can and assist me as much as you can.

Fortified with a copy of this letter, but apparently without telling Hurd he had it, Jacobsen confronted Hurd about it on the telephone. Hurd again denied ever contacting the bank about the Aspedon matter.

The commission concluded that Hurd's statements to the court and to attorney Jacobsen were "clearly false and knowingly false" at the time he made them. We agree.

III. *Conclusion.*

In order to sustain a finding of disciplinary violations there must be a con-

vincing preponderance of the evidence. *Committee on Professional Ethics and Conduct v. Freed,* 341 N.W.2d 757, 759 (Iowa 1983). A convincing preponderance of the evidence is a greater quantum of evidence that that required in a civil trial, but less than that required to sustain a criminal conviction. *Id.; Committee on Professional Ethics and Conduct v. Bitter,* 279 N.W.2d 521, 522 (Iowa 1979). The burden of proof, of course, is on the complainant. *Freed,* 341 N.W.2d at 759.

We reject Hurd's argument, as we did in his last appeal, that these are quasi-criminal proceedings entitling him to the unique protections of our criminal procedure. *See Hurd,* 360 N.W.2d at 100. Rather, a disciplinary proceeding involves inquiring into the fitness of a member of the bar to continue to practice law, a civil investigation by the court into the conduct of its officers. *See Iowa State Bar Association v. Kraschel,* 260 Iowa 187, 193, 148 N.W.2d 621, 625 (1967). In considering an attorney's fitness to continue in the practice of law, we will consider the attorney's involvement in prior disciplinary proceedings. *See Hurd,* 360 N.W.2d at 105; *Committee on Professional Ethics and Conduct v. Kelly,* 357 N.W.2d 315, 319 (Iowa 1984).

Our review is de novo, but we give respectful consideration to the commission's findings. *Freed,* 341 N.W.2d at 758; *Committee on Professional Ethics and Conduct v. Rogers,* 313 N.W.2d 535 (Iowa 1984).

We conclude that the allegations of the complaint have been established by a convincing preponderance of the evidence and that Hurd violated the statutory and disciplinary standards set out below. First, he violated Iowa Code section 610.15 (1983) (now found as Iowa Code section 602.10113 (1985)), which prohibits deceit or collusion by an attorney. Hurd's acts also violated these provisions of DR 1–102: DR 1–102(A)(1) (violation of a disciplinary rule), (4) (dishonesty, fraud, deceit, or misrepresentation), (5) (conduct prejudicial to the

administration of justice), (6) (conduct adversely reflecting on attorney's fitness to practice law); DR 7-102(A)(5) (knowingly making a false statement of law or fact); and these ethical considerations prescribing acceptable conduct for attorneys: EC 1-5; EC 8-5; EC 9-1; and EC 9-6.

## IV. *Disposition.*

■ We come to the difficult matter of disposition. The commission recommended a suspension which would begin at the expiration of the suspension imposed in Hurd's most recent disciplinary case and extending for a period of at least two years. We give their recommendation considerable weight. The commission's ruling in this case is thoughtful and persuasive. In fact, the commission has done a commendable job throughout this case in dealing with what appears to be a veritable barrage of procedural stumbling blocks at almost every stage.

While the commission's specific recommendation is a suspension of Hurd's license, there is an undercurrent in its ruling which suggests that a more severe sanction may be appropriate. The commission said, in discussing the recommended disposition, that

> it is the opinion of this division of the Grievance Commission that the license of the respondent should be suspended for a period sufficiently long that the respondent would be deterred from engaging in similar unethical or unprofessional conduct and probably sufficiently long so that he would opt to enter into another field of work or profession.

Iowa Code section 602.10113 (1985) attests to the importance placed upon integrity in an attorney. It provides:

> An attorney and counselor who is guilty of deceit or collusion, or consents thereto, with intent to deceive a court or judge or a party to an action or proceeding, is liable to be disbarred, and shall forfeit to the injured party treble damages to be recovered in a civil action.

This respondent has shown a history of deceit on the court, and on other counsel, as shown by this record and the records in his previous disciplinary cases.

In the first case, *Committee on Professional Ethics and Conduct v. Hurd,* 325 N.W.2d 386 (Iowa 1982), this respondent altered a motion after it had been approved by opposing counsel and granted by the order of a magistrate. He filed the altered motion, then sent an unaltered copy to opposing counsel with a note in which he falsely stated that "this was filed in the office of the clerk, Ida Dist. Court, August 8, 1980." We held this constituted deceit on opposing counsel and ordered Hurd's license suspended. (Evidence at the commission hearing showed Hurd was reinstated on February 14, 1983. It was less than three months later when the deceit in connection with the visitation hearing occurred.)

In the second case, *Committee on Professional Ethics and Conduct v. Hurd,* 360 N.W.2d 96 (Iowa 1984), we also found deceit, primarily based on false statements made by him in a motion for change of judge which, we found, contained "a number of palpably false statements." *Id.* at 104.

The record in the present case reinforces what we observed in Hurd's last appeal, where we stated:

> We conclude that respondent has demonstrated he will resort to dishonest conduct to achieve what he perceives to be a desirable result for his client. In the process he has engaged in a false attack on the integrity of a judge just as he once tampered with the integrity of a court document. We believe his misconduct requires indefinite suspension of his right to practice law.

*Id.* at 106.

We believe the course of habitual conduct by this respondent indicates that he is not fit to practice law and that his license should be revoked. The type of fraud and deceit he has practiced upon the courts and opposing counsel has not only violated the rules of conduct set out above, it has frustrated the operation of the courts and has

likely served to undermine public confidence in them.

Lest it appear that, because we have ordered a more severe sanction than that recommended by the commission, Hurd has been prejudiced by appealing the commission ruling, we point out that we review these cases de novo. Even in the absence of an appeal, we make an independent judgment on the discipline to be imposed. *See* S.Ct.R. 118.10. That disposition may include an increased sanction. *Id.*

Under the circumstances of this case, we believe revocation is the appropriate remedy.

LICENSE REVOKED.

All Justices concur except CARTER, J., who dissents.

CARTER, Justice (dissenting).

Appellant's violations of the Code of Professional Conduct, while significant and fully deserving of a long period of suspension, do not in my view warrant a sanction of disbarment. I would adopt the recommendations of the Grievance Commission with respect to the sanctions to be imposed.