# IN THE SUPREME COURT OF IOWA

No. 113 / 05-0575

Filed April 21, 2006

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD**,

Complainant,

vs.

**JAMES W. MCGRATH**,

Respondent.

Appeal from the report of the Grievance Commission.

Grievance Commission recommends suspension of respondent's license to practice law based on respondent's attempted exchange of legal services for sex. **LICENSE SUSPENDED.**

Charles L. Harrington and David J. Grace, Des Moines, for complainant.

David L. Brown and Alexander E. Wonio of Hansen, McClintock & Riley, Des Moines, for respondent.

**TERNUS, Justice.**

This case is one of troubling contrasts. The respondent, James W. McGrath, has practiced law for many years in this state and has a good reputation among the bench and bar. Former female clients have accused him of attempting to obtain and in fact accepting sexual favors in payment for his legal services. McGrath's testimony cannot be reconciled with those of the complaining witnesses. With no small measure of disappointment in this respected member of the bar, we are convinced he is guilty of the misconduct described by his former clients. Therefore, we suspend his license to practice law in this state indefinitely with no possibility of reinstatement for three years.

I. *Procedural Background.*

On December 22, 2003, the Iowa Supreme Court Board of Professional Ethics and Conduct (now the Iowa Supreme Court Attorney Disciplinary Board) filed a one-count complaint against the respondent alleging that on December 30, 2000, McGrath "made sexual advances toward Heather Williams[, his client,] by proposing an exchange of sex for fees." The board claimed this conduct violated the Iowa Code of Professional Responsibility for Lawyers DR 1-102(A)(5), (6) and (7).

Nearly a year later, on November 3, 2004, the board was allowed to amend its complaint to add a second count. In Count II, the board alleged that beginning in 2000, the respondent represented one "Jane Doe" in a marriage dissolution action. The board asserted that McGrath and Doe engaged in sexual relations in exchange for legal services. This conduct, the board alleged, violated DR 5-101(B) and DR 1-102(A)(1), (5) and (6).

After a hearing before a division of the Iowa Supreme Court Grievance Commission, the commission issued its Findings of Fact, Conclusions of Law and Recommendations. Four of the five commissioners found the

testimony of Heather Williams "credible and compelling" and determined the board had proven that McGrath offered to represent Williams in a visitation dispute in exchange for sex, as alleged in count I. A one-year suspension was recommended. One commissioner dissented, notwithstanding his conclusion that "Williams believed at the time, and believed as she testified in the hearing, that respondent made sexual advances to her in a proposed exchange for legal fees." This commissioner concluded the board had not met its burden of proof, however, "[i]n light of the denials of the respondent, and in light of the extensive and credible character evidence respondent . . . presented."

With respect to count II, involving Jane Doe, four of the five commissioners concluded her testimony "was not sufficiently credible for the board to meet its burden of proof" in view of Doe's own admissions of having lied under oath and being a "compulsive liar." One commissioner dissented from this part of the commission's decision. (This commissioner was not the same one who had dissented from the commission's findings on count I of the complaint.) This dissenting commissioner found Doe to be a credible witness despite the respondent's attempts at impeachment. The dissenter gave numerous reasons for his credibility determination, stating in summary that Doe's "testimony rang true," and he "could find no reasonable motive for Jane Doe to have lied."

II. *Issues on Appeal.*

The respondent has appealed from the commission's report, raising several constitutional and evidentiary issues that we will address prior to considering the merits of the board's complaint. First, McGrath claims the commission erred in refusing to allow discovery of the board's investigative file and the medical and psychological records of the complaining witness in count I. He also argues the denial of this discovery violated his rights to

due process and equal protection of the laws. The respondent raises similar issues concerning the commission's refusal to allow him to depose the board's investigator. Finally, McGrath complains about the allowance of the amendment adding count II, the allowance of testimony from Doe and her former husband, and the general "unfairness" of the proceedings.[1] We will discuss each contention separately and then consider whether the board has proved the allegations made in its complaint.

III. *Discovery of Board's Work Product.*

A. *Factual background.* After the board filed its one-count complaint, the respondent requested production of the board's complete investigative file. The board produced 345 pages of documents, but objected to the production of "the work product of staff counsel, investigators or administrators of the board," pursuant to Iowa Court Rule 34.4. Rule 34.4(2) states that the board's files "shall be provided to the respondent within a reasonable time upon the respondent's request," "except for the work product of staff counsel, investigators, or administrators of the board." Iowa Ct. R. 34.4(2), para. 2.[2] In response to interrogatories filed by the

---

[1]McGrath has also challenged the commission's decision to admit the testimony of Shannon Jackson, a former client who testified to prior similar acts by the respondent that occurred in 1994 when McGrath represented her in a custody dispute. Jackson, who was young and attractive, testified that when she was unable to pay the respondent's fees, McGrath repeatedly asked, "[I]f he did a favor for me, if I would do a favor for him." Jackson retained other counsel after McGrath called her prior to an evening appointment and asked her "to wear something easy to get off" and "don't bring a crowd." In addition, to Jackson's testimony, a transcript of a record of these incidents made before the judge hearing Jackson's dissolution action was also admitted. We do not decide whether this evidence of prior bad acts may properly be considered in this case to demonstrate that Williams did not misconstrue McGrath's statement that "since he was doing something nice for me that I could do something nice for him" as a reference to sexual favors. Even without the evidence of prior, similar acts by the respondent, we conclude the board has proven its allegations by a convincing preponderance of the evidence. *See In re Interest of J.A.L.*, 694 N.W.2d 748, 753 (Iowa 2005) (declining to decide whether admission of prior-acts evidence was harmless error because review was de novo and even without prior-acts evidence, delinquency charge had been established beyond a reasonable doubt).

[2] Subsequent to the hearing in this proceeding, the following sentence was added to rule 34.4(2): "For purposes of this rule, "work product" does not include a written statement signed or otherwise adopted or approved by the person making it or a

respondent, the board identified Elayne Sobel, the board's paralegal/investigator, as a person involved in the board's investigation.

After receiving the board's responses, the respondent sought to compel production of the withheld work-product materials, claiming the failure to produce these documents violated his due process right to "evidence favorable to the accused [that is] material to either guilt or punishment." He also claimed his rights under the federal and state Equal Protection Clauses were violated because similarly situated individuals—judges subjected to disciplinary proceedings—are allowed to view *all* records and papers contained in the investigative file of the Commission on Judicial Qualifications. *See* Iowa Ct. R. 52.5(3) (prohibiting disclosure of "[a]ny records and papers contained in the commission's investigation file" other than to "the judicial officer, employee, the attorneys, or the attorneys' agents involved in the proceeding before the commission"). The respondent also noticed the deposition of Sobel, the board's investigator, but the board objected to the taking of her deposition, claiming her work product was confidential under court rule 34.4 and Iowa Rule of Civil Procedure 1.503. *See generally* Iowa Ct. R. 35.6 (stating discovery shall be permitted in a disciplinary action as provided in specified rules of civil procedure, including Iowa Rule of Civil Procedure 1.503).

On April 13, 2004, the commission ruled on the respondent's motion to compel and the board's objections to Sobel's deposition. Although the commission ordered the board to furnish a list of persons interviewed by Sobel, it denied the remainder of McGrath's motion. The commission also refused to allow the deposition of Sobel. Both decisions were based on the protection of work product found in court rule 34.4(2).

---

contemporaneous and substantially verbatim transcript or recording of a person's oral statement." Iowa Ct. R. 34.4(2), para. 2.

After the board amended its complaint on November 4, 2004, to add a second count involving Jane Doe, it amended its answers to interrogatories on December 8, 2004, to indicate that Doe and Doe's ex-husband would testify at the hearing and Sobel may be called as a witness "[i]f necessary" to "testify that on August 17, 2004, [Jane Doe] told her that [Doe] had sex with respondent in exchange for his legal services." The respondent then renewed his request for the board's investigatory file and for Sobel's deposition. On the same day the respondent filed his discovery demands, the board obtained a signed affidavit from Doe admitting her sex-for-fees arrangement with McGrath, and so a few days later, the board withdrew Sobel from its witness list. Thereafter, the commission denied the respondent's discovery requests, and the matter proceeded to hearing on January 11, 2005.

As noted earlier, McGrath claims the commission's rulings protecting the board's work product from discovery were erroneous. He also asserts the limitations imposed on his discovery violated his due process and equal protection rights.

B. *Correctness of rulings.* This court has held that Iowa Court Rule 34.4(2) protects from discovery the board's investigative reports and the work product of its counsel and staff. *See Comm. on Prof'l Ethics & Conduct v. Hurd,* 375 N.W.2d 239, 241-42 (Iowa 1985) (applying Rule of Procedure 2.1(d) of the Professional Ethics & Conduct Committee, now Iowa Court Rule 34.4(2)) (*Hurd II*); *Comm. on Prof'l Ethics & Conduct v. Hurd,* 360 N.W.2d 96, 100-01 (Iowa 1984) (same) (*Hurd I*). In essence, such materials "are made privileged" by the rule. *Hurd I,* 360 N.W.2d at 101. Because the board produced its entire file with the exception of work product materials, the commission properly denied McGrath's motion to compel. The additional documents sought by the respondent were clearly privileged and

not subject to discovery. *See Hurd II*, 375 N.W.2d at 242 (holding commission's denial of attorney's request for board's reports and investigation was proper because these documents were confidential); *Hurd I*, 360 N.W.2d at 101 (holding commission correctly denied respondent access to board's investigative report and staff counsel's work product because these materials were privileged).

We are also convinced the testimony of the board's investigator is protected by the same rule. The privilege accorded the board's work product by rule 34.4(2) would have little value if the person preparing that work product could be compelled to testify. This conclusion is not altered by the fact Sobel was briefly listed by the board as a potential witness. To the extent the board waived the protection afforded by rule 34.4(2) by its short-lived designation of Sobel as a witness, the board's removal of Sobel from its witness list prior to the hearing also constituted a withdrawal of any implied waiver of the work product privilege. *See Squealer Feeds v. Pickering*, 530 N.W.2d 678, 685 (Iowa 1995) (holding withdrawal of designation of prior attorney as an expert witness before the disclosure of any confidential communications constituted withdrawal of implied waiver of attorney-client privilege), *abrogated in part on other grounds by Wells Dairy, Inc. v. Am. Indus. Refrigeration, Inc.*, 690 N.W.2d 38, 47-48 (Iowa 2004). Accordingly, we hold the commission did not err in denying McGrath's request to depose investigator Sobel.

C. *Due process.* Relying on criminal cases holding a defendant has a right to discover exculpatory evidence, McGrath claims his due process rights were violated here because the testimony of the board's investigator would have impeached Jane Doe. *See generally Brady v. Maryland*, 373 U.S. 83, 86, 83 S. Ct. 1194, 1196, 10 L. Ed. 2d 215, 218 (1963) (holding prosecution's failure to produce exculpatory evidence was a violation of the

Due Process Clause of the Fourteenth Amendment); *State v. Romeo*, 542 N.W.2d 543, 551 (Iowa 1996) (holding "[e]vidence that may be used to impeach a witness's credibility is included in [*Brady*] rule"). It is not entirely clear what exculpatory evidence McGrath sought from the board's investigatory file, but it appears he wanted, at a minimum, documentation of Sobel's communications with Doe.

An attorney is entitled to procedural and substantive due process in disciplinary proceedings. *Hurd I*, 360 N.W.2d at 100. But a respondent in a disciplinary proceeding is not entitled "to the unique protections" afforded a criminal defendant. *Hurd II*, 375 N.W.2d at 246. We need not determine, for purposes of the case before us, the precise extent of an attorney's right to exculpatory materials. Even if we assume McGrath has the same right to exculpatory evidence that a criminal defendant has, his due process rights were not violated by the discovery rulings of the commission.

We first observe that the Due Process Clause does not give the respondent "a right to rummage through the [board's] file to search for exculpatory material." *Hurd I*, 360 N.W.2d at 100. Therefore, the commission's refusal to order the production of the board's complete file was not a due process violation. We focus, then, on the specific material McGrath apparently viewed as exculpatory: Sobel's conversations with Doe.

To prove a *Brady* violation, McGrath must show (1) the board suppressed the requested evidence, (2) the evidence was favorable to McGrath, and (3) the evidence was material to whether he was guilty of the ethical charges. *See Romeo,* 542 N.W.2d at 551. We do not consider whether the first two elements are present because we are confident evidence of Sobel's conversations with Doe was not "material" as that term is used for purposes of the *Brady* rule.

> Whether . . . evidence [is] material depends on whether "there is a reasonable probability that . . . the result of the proceeding would have been different." A "reasonable probability" of a different result is shown "when the [board's] evidentiary suppression 'undermines confidence in the outcome of the [hearing].' " The [respondent] need not show that the disclosure of suppressed evidence would have resulted in [dismissal of the charges].

*Id.* (citations omitted).

In *Romeo*, this court considered the effect of the prosecution's failure to disclose impeachment evidence. In that case, the prosecution did not reveal that the authorities had agreed to drop habitual-offender charges against a witness testifying against the defendant in exchange for the witness's cooperation in the defendant's prosecution. *Id.* We held this evidence was not material because the defendant's attorney knew the State's witness was "testifying under an agreement with the prosecuting authorities and he cross-examined [him] on this point at trial." *Id.* at 552. Thus, even if defense counsel had brought out the habitual-offender aspect of the witness's deal with the government, it was not reasonably probable that this fact would have changed the jury's evaluation of the witness's credibility. *Id.*

The *Romeo* case illustrates the rule that there is no due process violation when the suppressed impeachment evidence is already, in substance, in the record or is merely cumulative to other admitted evidence. *See Miller v. Dretke,* 431 F.3d 241, 251 (5th Cir. 2005); *United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir. 1987). When substantially the same evidence is already in the record, it can be reliably concluded that the suppressed impeachment evidence would have had no significant effect on the witness's credibility. *See McHone v. Polk*, 392 F.3d 691, 700 (4th Cir. 2004); *Skinner v. Cardwell,* 564 F.2d 1381, 1386 (9th Cir. 1977); *Rowe v. Grizzard,* 591 F. Supp. 389, 397 (E.D. Va. 1984). Because there is not a

reasonable probability that cumulative impeachment evidence would change the outcome of the proceeding, such evidence is not considered material. *See Brewer v. State*, 444 N.W.2d 77, 83 (Iowa 1989) (holding failure of prosecution to reveal complete details of star witness's grant of immunity was not a *Brady* violation in part because the evidence was not material).

Applying these principles here, we conclude the evidence sought by the respondent was not material. Doe testified at the hearing that, at McGrath's request, she engaged in sexual relations with him in payment for his legal services. McGrath's counsel brought out in his cross-examination of Doe that she had denied such a relationship on several occasions in the past. Doe testified her fee arrangements with McGrath became an issue in the dissolution action in which McGrath was representing her. She admitted she signed an affidavit that was filed in that matter in which she denied exchanging sex for fees. In addition, Doe testified that when McGrath's attorney telephoned her prior to the hearing in the disciplinary case, she told him she had never had sex with the respondent. McGrath's counsel also brought out the fact that Doe did not want to be involved in the disciplinary proceedings and had initially refused to cooperate with the board. Doe admitted that after she had been subpoenaed for a deposition in the disciplinary case, she told the board's counsel that she would "say anything" and that she was a "compulsive liar." Finally, McGrath's counsel obtained admissions from Doe that she had alleged to him and to the respondent that the board's investigator harassed her with phone calls in an effort to obtain her testimony. Clearly, the respondent was able to use Doe's prior inconsistent statements and her perception of the board's communications with her to call into question the truth of her testimony as well as the voluntariness of it. We think any testimony by investigator

Sobel would have been merely cumulative and would not have added significantly to the impeachment potential of the evidence already in the record. Therefore, evidence from the board's file or from Sobel herself regarding Sobel's conversations with Doe was not material.

McGrath's generalized assertions in his brief that the board's refusal to turn over its investigative materials "left McGrath in a situation where he was unable to fully prepare a defense" and "effectively blindsided" him at trial does not alter our conclusion. These allegations are unconvincing because the record shows McGrath undertook no discovery with respect to count II until less than a month before the hearing. Moreover, he vigorously *resisted* the board's attempt to take Doe's deposition, a deposition that would have given the respondent an opportunity for discovery as well. To the extent McGrath was unprepared for the hearing, he cannot fault the board for his predicament. McGrath's allegations of prejudice are also legally inadequate to establish the materiality of the evidence in question. "[G]eneralized assertions [that the defense was hindered] are insufficient to establish a reasonable probability of a different outcome." *State v. Piper*, 663 N.W.2d 894, 905 (Iowa 2003). For these reasons, we conclude the commission's refusal to order the production of the board's investigative file or to compel Sobel's deposition did not violate McGrath's due process rights.

D. *Equal protection.* The respondent argues his right to equal protection was violated because, with respect to the discovery of investigative materials, attorneys are treated differently in disciplinary cases than are judges subjected to similar proceedings. "Equal protection requires only that those in similar positions be treated alike." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wherry*, 569 N.W.2d 822, 827 (Iowa 1997). Assuming for purposes of our discussion that lawyers and judges who are the subject of disciplinary charges are similarly situated, we believe

they are treated the same—neither is allowed privileged work product from the investigation of the prosecuting authority.

Iowa Court Rule 52.5(3) makes all records of the Iowa Commission on Judicial Qualifications "privileged and confidential," but with one exception discussed below, authorizes their release to "[t]he judicial officer . . . involved in the proceeding before the commission." Iowa Ct. R. 52.5(3). Although the broad discovery permitted by rule 52.5(3) appears at first blush to support McGrath's contention that attorneys are treated less favorably than similarly-situated judges, a closer examination of the disciplinary systems for attorneys and judicial officers reveals that lawyers and judges are actually treated in the same way.

The commission on judicial qualifications receives complaints concerning judicial officers and eventually adjudicates the charges. *See* Iowa Code §§ 602.2102, .2104 (2005). With respect to its adjudicative role, the judicial qualifications commission performs the same function as the grievance commission, which hears and determines attorney disciplinary charges. *See* Iowa Ct. Rs. 36.14, .15. Significantly, the judicial qualifications commission, like the grievance commission, does not prosecute the charges. That role is performed by the attorney disciplinary board in the attorney disciplinary system and by the attorney general in the judicial disciplinary system. *Compare Comm. on Prof'l Ethics & Conduct v. Michelson*, 345 N.W.2d 112, 116 (Iowa 1984) (stating the board "stand[s] in the shoes of a prosecutor"), *and* Iowa Ct. Rs. 34.3, 35.2 (providing for board to process complaints, including deciding whether a complaint should be dismissed or whether it should be prosecuted before the grievance commission), *with* Iowa Code § 602.2104 (requiring attorney general to prosecute charges before judicial qualifications commission).

It is apparent that the judicial qualifications commission is not equivalent to the attorney disciplinary board in terms of the role it performs in the disciplinary process. The comparable entity to the board is the attorney general. Notably, there is no rule or statute making the work product of the attorney general's office discoverable. In fact, rule 52.12(6) specifically provides that "[t]he investigative file of the commission does *not* include the recommendations of the attorney general to the commission. The recommendations of the attorney general to the commission are privileged and are not to be transmitted [to the judicial officer charged in the complaint]." Iowa Ct. R. 52.12(6) (emphasis added); *accord In re Inquiry Concerning Stigler*, 607 N.W.2d 699, 706-07 (Iowa 2000).

As a review of the applicable rules and statutes demonstrates, a judicial officer who is the subject of a disciplinary complaint is not provided access to the files of the prosecutor—the attorney general. Attorneys charged with an ethical violation are treated no differently; the work product of the prosecutor—the board—is not discoverable. There is no equal protection violation.

IV. *Discovery of Medical Records of Complaining Witness.*

McGrath sought to discover the medical records of Heather Williams, the complaining witness in count I. The board produced a one-page report from a physician treating Williams for mental health issues, but stated it did not have possession, custody, or control of any other medical records concerning Williams. McGrath's motion to compel was denied by the commission. Subsequently, the respondent deposed Williams and questioned her extensively concerning her mental health problems and treatment. Williams refused to answer questions regarding her treatment or to voluntarily produce her medical records.

McGrath complains on appeal that he was prevented from properly defending the charges against him because he did not have access to Williams' mental health records. Before prejudice becomes relevant, however, there must a demonstration of error in a commission ruling. The only ruling before us for review is the commission's refusal to compel the board to produce Williams' medical and mental health records. The respondent does not indicate how this decision was incorrect other than to assert that Iowa allows "very liberal access to records, including medical records." We find no merit in the respondent's challenge to the commission's ruling.

Iowa Court Rule 35.6 states that discovery shall be permitted in a disciplinary action as provided in specified rules of civil procedure, including Iowa Rules of Civil Procedure 1.501 through 1.517. Rule 1.503 permits discovery "regarding any matter, *not privileged*, which is relevant to the subject matter involved in the pending action." Iowa R. Civ. P. 1.503(1) (emphasis added). Rule 1.512 authorizes the production of documents "which are in the possession, custody or control of the party upon whom the request is served." Iowa R. Civ. P. 1.512(1).

The record before us shows the board did not have possession, custody, or control of Williams' mental health records. Therefore, it had no obligation to produce them for the respondent. *Cf. State v. Smith*, 522 N.W.2d 591, 594 (Iowa 1994) (holding State, in prosecution of sexual-abuse charge, had no obligation to produce mental health records of complaining witness because requested records were not in State's possession, custody, or control). In addition, Williams did not waive the physician-patient privilege when she made a charge of sexual misconduct against McGrath. *Cf. id.* at 595 (holding complaining witness had not waived the physician-patient privilege by asserting she did not consent to the defendant's sexual

acts). Consequently, the commission properly refused to compel the production of Williams' mental health records.[3]

V. *Fairness of Proceedings.*

McGrath's brief contains a division with a heading alleging the commission erred in allowing the board to amend its petition to add a second count, in allowing Jane Doe and her former husband to testify, and "in creating a procedural and trial climate that was fundamentally unfair and a violation of due process." We will address each contention separately.

A. *Amendment of board complaint.* The rules governing attorney discipline provide that "the commission may permit amendments to the complaint . . . to raise new matters as long as the respondent has . . . a reasonable time to prepare a defense thereto prior to the date set for hearing." Iowa Ct. R. 35.6. We think McGrath had a reasonable time to prepare his defense.

In August 2004, the board received an unsolicited complaint from the ex-husband of Jane Doe, alleging sexual improprieties by McGrath involving Doe. On August 17, 2004, the board notified McGrath of this additional complaint and informed him the board would investigate the allegations and consider the matter at a future meeting. McGrath was asked to respond as required by Iowa Court Rule 34.7, and he did so, denying any misconduct. On August 23, 2004, counsel for the board notified the respondent's attorney that if the board chose to prosecute this complaint, it would want

---

[3] The respondent's argument concerning discovery of Williams' mental health records appears in a division of his brief that asserts in the heading "the grievance commission erred in failing to properly apply the due process and equal protection provisions of both the federal and Iowa constitutions." Notwithstanding this introductory heading, McGrath makes no argument addressing the due-process or equal-protection implications of the commission's ruling on the medical-records issue. Nor does he cite any authority in his argument on this issue that discusses these constitutional provisions. Accordingly, we consider the due-process and equal-protection challenges to the medical-records issue to be waived. *See* Iowa R. App. P. 6.14(1)(*c*) ("Failure in the brief to state, to argue or to cite authority in support of an issue may be deemed waiver of that issue."); *City of Marquette v. Gaede*, 672 N.W.2d 829, 835 (Iowa 2003) (same).

to combine it with the current proceeding against McGrath, which had been scheduled for hearing in January 2005. On October 4, 2004, more than three months before the scheduled hearing on the Williams charge, the board filed a motion for leave to amend the complaint pending before the commission to add a second count, the Doe charge. Over McGrath's objections, the commission allowed the amendment, concluding the respondent had made no showing that he would be unable to adequately prepare his defense if the amendment were granted. The amendment was filed on November 4, 2004, and the case proceeded to hearing on January 11, 2005.

As shown by the record, McGrath received a copy of the Doe complaint nearly five months before the hearing. He knew shortly thereafter that the board would attempt to have this complaint heard with the pending Williams matter, so he could hardly have been surprised when six weeks later the board sought to amend the Williams complaint to add the Doe charge. Moreover, there was nothing unusual about the timeframe within which the hearing on the amended complaint was held. The hearing took place sixty-eight days after the amended complaint was filed. Iowa Court Rule 35.7(1) states that the hearing before the grievance commission "shall be held not less than 60 days nor more than 90 days after the service of the complaint." Iowa Ct. R. 35.7(1), para. 3. Thus, McGrath received the amount of time anticipated by our rules to prepare for the hearing.[4]

We perceive no unfairness in the schedule set by the commission. Furthermore, the respondent has not assisted this court in identifying any unfairness because he has failed to specify why he was unable to

---

[4]We note the respondent had already been granted two continuances in this matter. The Williams charge, which was filed on December 22, 2003, was originally scheduled for hearing on April 21, 2004. At the respondent's request, the matter was rescheduled for July 22-23, 2004. The hearing was subsequently continued a second time at the request of the respondent and set for trial on January 11-12, 2005.

adequately prepare a defense for the January hearing. We hold the commission did not abuse its discretion in permitting the amendment, and the prosecution of the additional count did not render the proceedings unfair.

B. *Testimony of the Does.* The respondent's complaint regarding the Does' trial testimony is apparently based on his alleged inability to depose them prior to the hearing. As noted earlier, the respondent sought to quash the board's attempt to depose Jane Doe and continued to resist her deposition as late as December 22, 2004. In addition, although McGrath eventually requested the Does' depositions, he did not do so until January 3, 2005, more than thirty days beyond the filing of the amendment and approximately one week before the scheduled hearing. The commission denied the attempted discovery as untimely. *See generally* Iowa Ct. R. 35.6 (providing that discovery must be commenced within thirty days after service of the complaint). McGrath's own actions in failing to pursue timely depositions of the Does cannot serve as a basis to preclude the testimony of these witnesses at the hearing.[5] There was nothing unfair in the commission's allowance of their testimony.

C. *General fairness of proceedings.* McGrath expends considerable effort complaining about the unfairness of the proceedings in general. The majority of these complaints centers on the discovery and scheduling issues, which we have already determined were correctly resolved and did not result in an unfair proceeding. We have carefully considered McGrath's

---

[5] The respondent blames his late request for the Does' depositions on the timing of Jane Doe's affidavit, which was signed on December 17, 2004. He claims he was "blindsided" by the late filing of this affidavit and the ruling denying him the opportunity to depose the Does. But Doe's affidavit was not the first time McGrath was informed of the nature of the Does' testimony. The board supplemented its answers to interrogatories on December 8, 2004, stating Doe was "expected to testify that in connection with her divorce, she had sex with respondent in exchange for legal services" and that John Doe would "testify that his ex-wife told him on several occasions that she and respondent exchanged sex for fees."

additional allegations that the hearing was "procedurally prejudicial and defective" and that the "entire procedural chain of events" subjected him to a "trial by ordeal." Our review of the voluminous pleadings in this case confirms the contentious nature of this proceeding. Discovery disputes were ongoing. At one point the respondent even sought to enjoin the board from continuing its investigation of Williams' complaint. Few rulings of the commission were not followed by a motion to reconsider. To the extent this matter became an "ordeal," the respondent must assume his share of responsibility for the tenor of these proceedings. A painstaking review of the full record in this case persuades us the board acted fairly and responsibly in investigating the complaints against the respondent, the respondent had an entirely adequate opportunity to defend himself, and the hearing was procedurally and substantively fair.

VI. *Factual Findings.*

A. *Standard of review.*

We review the findings of the grievance commission de novo. Iowa Ct. R. 35.11(3). Although we give weight to the commission's findings, especially when considering the credibility of witnesses, we are not bound by those findings. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. O'Brien*, 690 N.W.2d 57, 57 (Iowa 2004). "The burden rests on the [b]oard to prove the alleged disciplinary violations by a 'convincing preponderance of the evidence.' " *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Mulford*, 625 N.W.2d 672, 679 (Iowa 2001) (citation omitted). "A convincing preponderance of the evidence is a greater quantum of evidence than that required in a civil trial, but less than that required to sustain a criminal conviction." *Hurd II*, 375 N.W.2d at 246.

19

B. *Williams charge.*

1. *Evidence.* Heather Williams testified that in the fall of 2000, she was experiencing difficulty obtaining court-ordered visitation with her son, who was in the physical care of his father. Seeking legal assistance, she made an appointment with McGrath in early November 2000. On her initial visit to his office, Williams was accompanied by her mother. McGrath indicated his retainer was $1500, and Williams agreed to find the money. McGrath said he would get the pertinent documents from the courthouse.

On December 29, 2000, McGrath called Williams and asked her to meet him the next day, Saturday, at his office. Williams went to McGrath's office on December 30 alone. She gave the respondent $300 in cash, which McGrath accepted. McGrath told her the only obstacle to him getting started on her case was her payment of the retainer. In response to her statement that $1500 was a lot of money, McGrath told her she could just pay out-of-pocket expenses. Williams testified: "He said that since he was doing something nice for me that I could do something nice for him." When she asked him what he meant, McGrath said, "What do nice girls do for boys?" At that point, Williams began to get the idea that McGrath was proposing sex in exchange for fees. Trying to ignore the implication, she responded, "Cook them dinner?" McGrath laughed, but then asked, "What wouldn't you do to get your son back?" According to Williams, McGrath then asked her if she wanted to fool around on the couch. He also told her what days his secretary was out of the office, and that she—Williams—could come in on those days. He said Williams would not have to pay him any money. When Williams began making excuses for needing to leave, McGrath told her to take the weekend to think about his proposition. Upset, Williams immediately left.

Shortly thereafter, Williams called the respondent's office and told his secretary that she had decided to hire a different attorney. She then went to McGrath's office and picked up the papers he had obtained from the courthouse as well as her $300 payment.

On cross-examination, Williams acknowledged that she suffered from a bipolar disorder, for which she has been hospitalized and for which she takes medication. Williams denied that her illness affected her memory or her ability to tell the truth. Williams also admitted on cross-examination that she had failed to make court-ordered child support payments.

The respondent's attorney also questioned Williams concerning a statement she made in her complaint to the board that McGrath "is known for doing this and it has been going on for quite some time." When asked by McGrath's attorney about the basis for this statement, Williams could identify only one person—Vicki Riegel—who had had a similar proposal from the respondent (sex for fees) when he was acting as Riegel's attorney.

Attorney Robert Box also testified at the hearing. He agreed to represent Williams in her visitation dispute after she terminated McGrath's representation. Box said Williams told him about McGrath's proposal in early January 2001. Box recalled that Williams "appeared . . . somewhat embarrassed, upset and basically concerned and didn't know what to do." He gave her information for making an ethics complaint against the respondent.[6]

McGrath testified that he was sixty years old and had been practicing law since 1971, primarily in the personal injury and dissolution areas. At

---

[6] Williams filed her complaint with the board on January 17, 2001. McGrath was immediately notified of Williams' complaint and given a copy of it. In his response of February 7, 2001, he denied that an attorney-client relationship existed between him and Williams, but he admitted seeing her on three occasions, the last time on December 30, 2000.

the time of hearing, McGrath was in his fourth marriage. He was unmarried during the year 2000 and the first part of 2001.

The respondent recalled Williams first came to his office with her mother, seeking assistance with a visitation dispute. He told her he would need to be paid a retainer before accepting her case, but he would at least take a look at the court file. Upon reviewing the court file, he noted Williams' prior attorney had withdrawn due to nonpayment of fees.

McGrath claimed there was a second meeting between him and Williams after he obtained the court file and before the December 30 visit. He testified that at this second meeting, Williams told him she was seeing a therapist for her "problems with men." She also stated she wanted custody, not just visitation, and that she was behind in her child support payments. McGrath told her she would have to start paying child support to have a chance of getting custody, and that a custody action would be much more expensive that a modification of visitation.

McGrath testified the third and final meeting between them occurred on Saturday, December 30, 2000, at Williams' request. He advised her at that time that he would handle the visitation issue on a pro bono basis if she would pay the out-of-pocket expenses. He told her he would not be willing to represent her on the same basis in a custody dispute due to the amount of time that would be involved. Finally, McGrath said he would need to talk to her previous lawyer and her therapist before he would be willing to start a custody modification action. Williams, he claimed, did not think it was necessary for him to speak to her former lawyer or her therapist. According to McGrath, Williams indicated the prior lawyer had made improper suggestions to her and had used her nonpayment as an excuse to withdraw after she objected to those suggestions. McGrath says he concluded this meeting by telling Williams to think about what she

wanted to do. The respondent denied that Williams made a payment at this meeting, but he testified that she apparently must have done so because his secretary later found three hundred dollars lying on the floor in front of his desk.

McGrath testified the following week Williams called his office and said she was going to see another lawyer. Later, she picked up the documents from his office, and her money was returned to her.

McGrath denied that he ever made any offers to Williams to exchange sex for legal fees. He specifically denied making any statement about what nice girls do. The respondent also asserted he did not have a couch in his office and that his grandson was in another room of his law office on December 30, 2000.[7] McGrath claimed it was not unusual for him to meet with clients when his staff was not there.

When asked whether he could explain why Williams would falsely accuse him of sexual improprieties, McGrath suggested she "came up with a reason that she could tell somebody about why she didn't want me involved in her case." He said she was upset when he insisted that she make her support payments before he could do anything on her case, and perhaps she did not like his advice. But he categorically denied that he ever "said anything to that woman about sex for fees."

2. *Commission's findings.* Because we give weight to the commission's factual findings, particularly with respect to witness credibility, we set out its findings concerning the Williams charge:

> In respondent's first meeting alone with Heather Williams, he offered in words or substance that in exchange for sex he would represent her in her visitation dispute. Words to

---

[7] McGrath's legal assistant also testified there was not a couch anywhere in the respondent's entire office. The commission concluded Williams' credibility was not "impeached by whether respondent actually had a couch in his office." It reasoned, "The statement 'do you want to fool around on the couch' could reasonably be interpreted as an invitation to engage in sex whether or not a couch actually exists." We agree.

the effect that "since he was doing something nice for her, she could something nice for him," followed by a question of whether she wanted "to fool around on the couch" could reasonably be interpreted to be an offer of legal services in exchange for sex. This is particularly true where respondent suggested meeting with Ms. Williams on Tuesday and Thursday evenings when no one else would be present in the office. Ms. Williams is young appearing and physically attractive. The testimony of Heather Williams was credible and compelling.

. . . .

. . . . The respondent's testimony that he did not make the improper statements to Heather Williams . . . was not credible when all of the contrary evidence is considered.

The commission member who dissented from the commission's determination that the board had proved count I did not entirely disagree with the commission's factual findings with respect to this count. This commissioner wrote:

I find that the testimony of Heather Williams, corroborated by the testimony of Attorney Robert Box as to her statements at a time shortly after the alleged solicitation, shows that Ms. Williams believed at the time, and believed as she testified in the hearing, that respondent made sexual advances to her in a proposed exchange for legal fees. I have no reason to believe that she was not telling the truth as she saw it. . . .

. . . .

. . . In light of the denials of respondent, and in light of the extensive and credible character evidence respondent has presented, I find that Complainant has not met its high burden of proof.

3. *Our findings.* In considering the evidence, as well as the commission's findings, we are persuaded the board has proven by a convincing preponderance of the evidence that McGrath solicited sexual favors from Williams in payment for his legal services. Like the commission, we find Williams' testimony credible. Any possible dissatisfaction with McGrath's advice seems to be a very unlikely impetus for the fabrication of Williams' accusations. Moreover, there is nothing in the record that would implicate Williams' mental health as a factor in her comprehension of reality. We have considered the testimony of several respected members of

the bench, bar, and local community who attested to McGrath's reliability, integrity and truthfulness. But the respondent's generally good character does not mean he has no flaws or weaknesses. We are convinced Heather Williams has brought to our attention a flaw or weakness in the respondent's character, one that naturally would be hidden from the professional associates of McGrath who testified at the hearing. In sum, the character evidence introduced by the respondent is not sufficient to overcome the credible and compelling testimony of the complainant. Therefore, we agree with the commission that the board has proven count I of its complaint.

C. *Doe charge.*

1. *Evidence.* In November 2000, Jane Doe engaged the respondent to represent her in a dissolution case that included a custody fight. Her husband, John, had obtained money from relatives to pay for his attorney, but, as Doe told the respondent, she did not have money or assets to pay for representation. The respondent, she claimed, informed her several times she "had other things to offer." She understood that the other things she had to offer were sexual favors. McGrath told her he "would call [her] when he wanted to have a meeting . . . and there might be a possibility of [her] going to his home; when he was done with [her] he was done and [she] wasn't to call him." Doe testified she wanted her children more than anything, so she agreed.

The respondent and Doe first had sex on the evening of December 5, 2000, when Doe went to McGrath's office at his request. According to Doe, they had intercourse on the floor of the library. The respondent did not use a condom; he told Doe he had no diseases and had had a vasectomy. Doe also testified the respondent was uncircumcised. She said she wore a trench coat with lingerie underneath and spiked heels, and her children

saw her when she returned home because she had locked herself out of the house.

Doe testified that, in addition to this incident, the respondent asked her to accompany him to the courthouse in a neighboring town to obtain papers filed in a domestic abuse action involving her husband. She brought her son along, and during the drive, the respondent lamented that he was "hoping to get road head," meaning oral sex while he was driving.

Doe told the commission that during an argument with her husband, John, in the summer of 2001, she told her husband that she had to sleep with the respondent just to get a divorce. She thought her husband might have compassion and stop their court battles if he knew what she was going through to litigate their disputes. Instead, John informed the court that his wife was having sexual relations with her attorney. Doe testified she falsely denied this charge in an affidavit prepared by the respondent and filed in the dissolution action.

Doe had one more sexual encounter with the respondent on Sunday, May 6, 2001. McGrath called Doe at home and asked her to come to his office. She did so, and they had sexual intercourse on the floor again. After this episode, Doe always took one of her children with her to the respondent's office or gave the respondent an excuse that she could not come when he called.

Doe testified she never paid any money to McGrath for his legal services. Although she received one bill from him after they first had sex, she complained to him, and she did not receive any further bills after that. Doe also testified that McGrath gave her $500 cash on two occasions, once to help her out with bills and once as payment for a used car she sold to him.

Doe never filed an ethics complaint against the respondent. She first learned that her ex-husband had done so when she was contacted by the board's investigator in August 2004. She described her reaction:

> I was upset about the whole proceeding because since this all has passed, my life is very quiet and comfortable; and I didn't want this in my life; and I didn't want to come here. And I contacted Jim [McGrath] and I asked to speak with him.
> He met with me and he told me that just, you know, follow his lead and do what he tells me and it will be all okay; it will all be okay.

Doe testified that she did not come willingly to the hearing; she was subpoenaed by the board.

On cross-examination, Doe admitted she told the respondent's attorney in a telephone conversation that she had never had sexual relations with McGrath and that she was being harassed by the board's investigator. (She later testified the investigator called her two to four times.) Doe said she was very uncomfortable with the whole situation. She also related a telephone conversation she had with the board's counsel. In that conversation, counsel advised Doe that "it was a federal crime to perjure [oneself]," information that scared her. Doe said she did not want to testify at the hearing so she told board counsel that she would "say anything" and that she was a compulsive liar. She denied at the hearing, however, that she was in fact a compulsive liar. The respondent's counsel also sought to impeach Doe by bringing out a romantic relationship Doe had with another man after she filed for divorce but while she was still married to John.

Doe's ex-husband, John, also testified at the hearing. He said he paid his attorney $25,000 for handling the divorce, and he does not know where his wife would have gotten any money to pay her attorney because money was "very tight." John was ordered to pay $500 toward Doe's attorney fees,

but he never did because he believed she was not paying any fees to McGrath. (McGrath testified at the hearing that he did not try to collect the $500 fee from John because he assumed it was uncollectible.) John recalled his wife telling him early on that she had found a lawyer who would let her work off her fees. He suspected she was "engaging in non-monetary compensation of Mr. McGrath" when his children told him that his wife left to see her lawyer late at night dressed in a trench coat, high heels, and "nothing but her underwear on." In addition, on an occasion when Doe was trying to make him feel guilty about spending his relatives' money on the divorce, she asked him how much money he was going to waste before they could get a divorce because "it wasn't costing her a dime." Another time she complained to him, "At least you don't have to sleep with a disgusting old man to keep fighting."

John Doe also testified that he filed an ethics complaint against McGrath in August 2004, sixteen months after the dissolution was final. He explained he was considering seeking a modification of his child support at the time, and he wanted to prevent his ex-wife from using McGrath if they went back to court because he thought McGrath "would represent her for free." John testified he was unaware of the pending complaint against McGrath when he filed his ethics complaint, that he did not know Shannon Jackson, and that he had not been contacted by anyone representing the board prior to filing his complaint. He said his ex-wife was very upset that he had filed the complaint, claiming she would have to leave the area "if this came out."

On cross-examination, John testified that his ex-wife had told him many lies, including a statement that she had had an extra-marital affair while they were still living together, a relationship she denied at the ethics hearing. John also said he suspected his wife of having had other affairs

while they were married. In addition, the respondent's counsel brought out allegations made by John in the dissolution case concerning Doe's emotional state and mental health at that time, including that she was manipulative and unstable.

McGrath denied that he had sexual relations with Jane Doe, but he confirmed he was uncircumcised. He testified that he had a written fee agreement with Doe, and that agreement was received as an exhibit. A billing statement was also admitted into evidence. According to this statement, Doe made three payments, a $750 payment on November 16, 2000, a $150 payment on March 28, 2001, and a $750 payment in the form of a car on July 18, 2001. McGrath asserted the first two payments were made in cash. He acknowledged he had not established a trust account ledger for Doe, and that he had no record of having received these payments other than the entries made on the bill. The respondent explained that he customarily distributed cash payments to his office employees as a bonus. He said he kept track of cash payments from clients on a separate sheet of paper at the back of his calendar, and then submitted this sheet to his accountant at the end of each year. He did not produce any documentation of this practice.

McGrath's legal assistant at the time of these events also testified concerning his billing system. She said McGrath kept time slips during the time he represented Doe, but they were shredded after the bill was prepared. (He no longer keeps time slips, but rather enters his time on the computer.) In addition, the office does not keep copies of bills, and the only billing statement admitted into the record had been printed from their computer records a few weeks before the hearing. The billing statement showed Doe had an outstanding balance of $4158.75. This statement also reflected that bills had been sent to Doe on January 31, February 28,

March 29, and May 30, 2001. The typical procedure would be for the witness to prepare the bills, and then the respondent would decide which ones to send to clients. When the witness was asked why no bills were sent after the divorce was final, she responded that "sometimes it's a save-your-stamp" situation. This witness had no independent recollection of mailing any bills to Doe or of receiving the indicated payments. She did recall getting a $200 cash bonus from McGrath in November 2000, and testified it was his normal procedure to distribute all cash payments from clients to the employees. She confirmed there was no trust account ledger for Doe and no deposit slips for sums paid by Doe. This witness also testified the respondent has computer access for inputting billing information.

2. *Commission's findings.* The commission made the following comments on the board's proof regarding the Doe charge:

> The testimony of Jane Doe was not sufficiently credible for the board to meet its burden of proof. Although the commission found her testimony to be consistent with the testimony from Heather Williams and Shannon Jackson insofar as an offer of services in exchange for sex, the commission does not believe that the [board] met its burden in establishing that her testimony was believable. The commission finds that Jane Doe's credibility was impeached by her own admissions of having lied under oath and being a "compulsive liar."

As noted earlier, one commissioner dissented from this finding, stating:

> I believe that the board has met its burden of proving by a convincing preponderance of the evidence that the respondent violated the Code as charged under count II. I found the testimony of Jane Doe to be very believable despite respondent's attempts at impeaching her credibility. Jane Doe's demeanor from the witness stand throughout her direct and cross examination led me to believe that she was telling the truth. Furthermore, she testified that she knew the penalties for perjury and I do not believe that respondent established any motive as to why Jane Doe would take the stand and lie under oath. In fact, Jane Doe was a reluctant witness who did not wish to pursue any complaint against respondent.
> . . . .

Jane Doe testified that respondent was uncircumcised. Respondent confirmed that he was uncircumcised. I believe that this testimony also supports Jane Doe's testimony that she had sex with respondent.

I do not believe that respondent introduced sufficient evidence to rebut Jane Doe's testimony that she was never charged by respondent or that she never paid any money for respondent's legal representation. Further, the fact that respondent's total bill for his services was one-fifth that charged by the lawyer representing her husband is consistent with Jane Doe's testimony that she was not charged for his services.

. . . All of her testimony rang true for me and I could find no reasonable motive for Jane Doe to have lied.

3. *Our findings.* Notwithstanding the deference this court typically gives to credibility findings made by the commission, we agree with the dissenting commissioner. We can understand the commission's reluctance to place any reliance on Doe's testimony at the hearing given the fact that over the last five years Doe has given two, contradictory versions of her relationship with McGrath. But while it is clear Doe has not always told the truth, that conclusion is not the end of the analysis. The critical question is: was she telling the truth when she said she exchanged sex for fees or when she denied having done so?

When we view her statements in the context in which they were made, we are convinced she was telling the truth on the occasions she asserted she had sex with McGrath in payment for his legal services. Doe's motivation to lie in the dissolution proceedings concerning the nature of her relationship with the respondent is apparent: she wanted the court to order her husband to pay her attorney fees, and she did not want to be viewed by the court as an unfit parent, thereby jeopardizing her quest for custody. On the other hand, we discern no credible explanation for why Doe would lie in this disciplinary proceeding. By all accounts, she had no complaints with McGrath's legal representation of her. She obtained custody of her children, and even if we believe McGrath's testimony that she made three

payments towards her legal fees, she paid a minimal amount in comparison to the cost of the divorce to her husband.

McGrath asserted at the hearing that perhaps Doe lied about having sex with him because she believed her husband had tape-recorded a telephone conversation in which Doe told her husband that she was exchanging sex for fees. (John had originally told the board investigator that he had a tape-recording of a phone conversation in which Doe made such allegations, but he was unable to locate the tape.) According to the respondent, Doe might then have felt compelled to testify consistently with what she had told her ex-husband. But we find this explanation contrary to human nature. Doe knew when she testified at the hearing that she would have to acknowledge that she lied at some point. (She told the board investigator she had sex with McGrath; she told the respondent's attorney she did not.) It would have been much easier for her and more protective of her reputation to say that she lied when she said she and McGrath had a sex-for-fees arrangement. We cannot imagine that she would perjure herself at the disciplinary hearing simply to remain consistent with tape-recorded statements she made to her ex-husband in the heat of a custody battle. The lack of documented payment of fees by Doe and the consistency of her testimony with that of Williams also support our credibility determination. And finally, the respondent has offered no explanation for how Doe would know that he was uncircumcised.

Although this court does not often disregard the credibility determinations of the commission, we do so here. We, like the dissenting commissioner, find Doe's testimony to ring true, and therefore, we conclude the board has proven count II by a convincing preponderance of the evidence.

VII. *Ethical Violations.*

The Iowa Code of Professional Responsibility for Lawyers DR 5-101(B) provides that a "lawyer shall not engage in sexual relations with a client."[8] As this court observed in *Iowa Supreme Court Board of Professional Ethics & Conduct v. Furlong,* 625 N.W.2d 711 (Iowa 2001):

> The vice involved in a lawyer engaging or attempting to engage in a sexual relationship with a client is clearly identified in Ethical Consideration 5-25 of the Iowa Code of Professional Responsibility for Lawyers:
> "The unequal balance of power in the attorney-client relationship, rooted in the attorney's special skill and knowledge on the one hand and the client's potential vulnerability on the other, may enable the lawyer to dominate and take unfair advantage. When a lawyer uses this power to initiate a sexual relationship with a client, actual harm to the client, and the client's interest, may result. Such overreaching by an attorney is harmful in any legal representation but presents an even greater danger to the client seeking advice in times of personal crisis such as divorce . . . ."
> This court has recognized that "the professional relationship renders it impossible for the vulnerable layperson to be considered 'consenting.' " Professional responsibility involves many gray areas, but sexual relationships between attorney and client is not one of these. Such conduct is clearly improper.

625 N.W.2d at 714 (citation omitted).

McGrath violated DR 5-101(B). In addition, his conduct was contrary to DR 1-102(A)(6), making it unethical for a lawyer to "[e]ngage in any . . . conduct that adversely reflects on the fitness to practice law," and DR 1-102(A)(7), making it unethical for a lawyer to "[e]ngage in sexual harassment." *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Steffes,* 588 N.W.2d 121, 124 (Iowa 1999) (stating "sexual harassment" is defined "as including 'sexual advances [and] requests for sexual favors' ").

VIII. *Sanction.*

---

[8] This prohibition is also found in the new Iowa Rules of Professional Conduct. *See* Iowa R. Prof'l Conduct 32:1.8(*j*).

For McGrath's attempt to obtain sex from Williams in exchange for legal services, the commission recommended the respondent's license be suspended indefinitely with no possibility of reinstatement for one year. We review this recommendation de novo. Iowa Ct. R. 35.11(3). Although we give respectful consideration to the discipline recommended by the commission, "the matter of sanction is solely within the authority of this court." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sloan*, 692 N.W.2d 831, 833 (Iowa 2005). In ascertaining the appropriate discipline, we consider

> the nature and extent of the respondent's ethical infractions, his fitness to continue practicing law, our obligation to protect the public from further harm by the respondent, the need to deter other attorneys from engaging in similar misconduct, our desire to maintain the reputation of the bar as a whole, and any aggravating or mitigating circumstances.

*Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Kallsen*, 670 N.W.2d 161, 164 (Iowa 2003).

The nature of the ethical infractions in this case is very disturbing. Williams and Doe sought the respondent's help with matters of paramount personal importance—custody of and visitation with their children. With their relationship with their children at stake and with no financial means, these clients were extremely vulnerable. Preying upon this vulnerability, the respondent manipulated these women—or, in Williams' case, attempted to do so—for his own sexual gratification. He suggested a sex-for-fees arrangement without ever expressly saying so, carefully choosing his words in an effort not to get caught.

We think the respondent's conduct warrants a lengthy suspension. *See Steffes*, 588 N.W.2d at 125 (two-year suspension for taking photographs of partially-clothed client under pretext photos needed to document back injury); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hill*, 540 N.W.2d

43, 45 (Iowa 1995) (twelve-month suspension for making inappropriate sexual advances toward client); *Comm. on Prof'l Ethics & Conduct v. Barrer*, 495 N.W.2d 756, 757 (Iowa 1993) (two-year suspension for making obscene phone calls to teenage boys); *Comm. on Prof'l Ethics & Conduct v. Vesole*, 400 N.W.2d 591, 593 (Iowa 1987) (three-year suspension for repeated instances of indecent exposure to women). McGrath's behavior was a gross breach of the trust bestowed on members of the bar and shows he is unfit to continue to serve as an officer of the court. We think a lengthy suspension is also necessary to protect members of the public as well as to discourage similar misconduct by other lawyers.

We suspend James McGrath's license to practice law in this state indefinitely with no possibility of reinstatement for three years from the filing of this opinion. This suspension shall apply to all facets of the practice of law. *See* Iowa Ct. R. 35.12(3). In addition, the respondent shall be prohibited from serving as a judicial magistrate during the period of this suspension. Upon application for reinstatement, McGrath shall have the burden to prove he has not practiced law during the period of suspension and that he has in all other ways complied with Iowa Court Rule 35.21. Costs are taxed to the respondent. *See* Iowa Ct. R. 35.25(1).

**LICENSE SUSPENDED.**