# IN THE SUPREME COURT OF IOWA

No. 08–1546

Filed March 19, 2010

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Appellant,

vs.

**JESSE M. MARZEN,**

Appellee.

On appeal of the report of the Grievance Commission of the Supreme Court of Iowa.

Appeal and cross-appeal from grievance commission decision finding respondent disclosed privileged information, but did not engage in a sexual relationship with a client. **LICENSE SUSPENDED.**

Charles L. Harrington and Elizabeth E. Quinlan, Des Moines, for appellant.

Roger L. Sutton of Sutton Law Office, Charles City, for appellee.

**CADY, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board alleged Jesse M. Marzen committed numerous violations of the Iowa Rules of Professional Conduct by engaging in a sexual relationship with a client, disclosing client confidences to the public, and making a misrepresentation to a judge. The grievance commission found there was insufficient evidence of an ethical violation on the charges of a sexual relationship with a client and a misrepresentation to a judge, but found Marzen violated disciplinary rules by disclosing client confidences. Upon our de novo review, we find Marzen violated the rules of professional conduct and impose an indefinite suspension not to exceed six months.

## I. General Background Facts and Proceedings.

Jesse M. Marzen is an Iowa lawyer. He was admitted to the practice of law in 2004 after graduating from St. Thomas School of Law. He practiced law in Charles City and is currently the Floyd County Attorney.

In September 2006, a complaint was filed against Marzen with the disciplinary board. It was filed by a woman named "Jane Doe."[1] She alleged Marzen engaged in a sexual relationship with her after representing her in a mental health commitment hearing. Soon after, a district court judge also filed a complaint against Marzen after hearing testimony from Doe, in the course of a hearing in an action to modify child custody, regarding a sexual relationship with Marzen.

---

[1]Due to the nature of the complaint and the accompanying factual background, we use the pseudonym "Jane Doe" to identify the woman involved in the proceedings against Marzen.

Marzen was a candidate for the position of Floyd County Attorney at the time the complaints were filed. News of the allegations against Marzen and of a potential investigation by the disciplinary board quickly spread throughout the immediate community and beyond and was highly publicized by the local and surrounding media. In response to media inquiries, Marzen spoke publicly about the allegations. He was subsequently elected as Floyd County Attorney in a hotly contested three-way race.

In 2007, the board brought three disciplinary charges against Marzen. Count I alleged Marzen engaged in sexual relations with Doe when she was his client. Count II alleged Marzen made a misrepresentation to a judge during the mental health commitment proceeding concerning Doe. Count III alleged Marzen disclosed information about Doe to the local press that he obtained in confidence during an attorney-client relationship. The board further alleged Marzen revealed information to the press that he knew was false.

At the hearing on the complaint, Doe testified she had sexual intercourse with Marzen on numerous occasions while he represented her. Marzen steadfastly denied any intimate contact with Doe. Following the hearing, the commission dismissed Count I (sexual misconduct) and Count II (misrepresentation) based upon insufficient evidence. It found the board proved Marzen revealed confidential information to the media without the consent of Doe, as alleged in Count III. The commission recommended Marzen be suspended for a period of three months. One member of the commission dissented from the dismissal of Count I. The dissenting member believed the events established at least one occasion of sexual intercourse between Doe and Marzen during the course of their attorney-client relationship.

The board filed an application to appeal Count I. We granted the application and further granted Marzen the right to cross-appeal. Marzen only cross-appealed as to Count III.

## II. Standard of Review.

We review attorney disciplinary proceedings de novo. Iowa Ct. R. 35.10(1). Although we give weight to the commission's factual findings, especially when considering the credibility of witnesses, we are not bound by them. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. O'Brien*, 690 N.W.2d 57, 57 (Iowa 2004). The board has the burden to prove the allegations of misconduct contained in the complaint by a convincing preponderance of the evidence. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Evans*, 537 N.W.2d 783, 784 (Iowa 1995). While this burden is higher than the burden in civil cases, it is lower than in a criminal prosecution. *Id.*; *accord Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Ronwin*, 557 N.W.2d 515, 517 (Iowa 1996).

## III. Discussion.

### A. Sexual Relationship.

1. *Legal framework.* The legal framework for considering a charge of sexual misconduct is well-established. Under our ethical rules, an attorney is prohibited from having a sexual relationship with a client when the client is not the lawyer's spouse or when the sexual relationship did not predate the initiation of the attorney-client relationship. Iowa R. Prof'l Conduct 32:1.8(j). This court has recognized that " 'the professional relationship renders it impossible for the vulnerable layperson to be considered "consenting" ' " to the sexual relationship. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Furlong*, 625 N.W.2d 711, 714 (Iowa 2001) (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hill*, 540 N.W.2d 43, 44 (Iowa 1995) (*Hill II*)).

In addition, a sexual relationship between an attorney and a client can be accompanied by circumstances that aggravate the misconduct. For instance, when the sexual relationship between an attorney and client involves a sex-for-fees arrangement, the misconduct is considered much more serious. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGrath*, 713 N.W.2d 682, 703–04 (Iowa 2006).

2. *Background facts.* The relevant facts relating to the charge of sexual misconduct first surfaced in January 2006, when Doe was involuntarily hospitalized after she overdosed on prescription drugs and alcohol and expressed suicidal thoughts. Marzen was court-appointed to represent her in the hospitalization commitment hearing. He met Doe for the first time on January 10, just prior to the hearing at the Mitchell County Courthouse in Osage, although he had seen her in town at various times in the past. Doe was released from the hospitalization commitment by the presiding judge at the conclusion of the hearing to pursue outpatient treatment.

After the hearing, Doe indicated she needed transportation to Charles City, and Marzen agreed to give her a ride. The two left together, alone, in Marzen's car, and two inconsistent accounts of what transpired in the following hours, days, and weeks emerged at the disciplinary hearing.

During the trip from Osage to Charles City, Doe discussed her need for additional legal services. Marzen agreed to represent her in a dispute with her mother, a child support collection action, and a modification-of-child-custody proceeding.

Doe testified Marzen took her to his house in Charles City after arriving from the hospitalization hearing in Osage, where they eventually engaged in various sex acts in the living room of the house. This

occurred after they consumed a few beers and exchanged a few vague references to an exchange of services. To support her testimony, Doe provided a description of the layout of Marzen's home and offered testimony about the presence of a quarter-sized mole on his back. Additionally, she said Marzen had "funny"-appearing buttocks due to a loose fold of skin hanging from the lower portion of his buttocks.

Doe testified she engaged in sexual intercourse with Marzen on four additional occasions—once more in Marzen's home, once in the home where she was residing, once in an automobile driven by Marzen, and once at Marzen's law office. She described each encounter in graphic detail. The car sex described by Doe occurred when the two drove to a storage facility in Osage under the auspices that it was necessary to examine the contents of a storage unit.

The board called several witnesses at the hearing in support of the testimony of Doe. One witness, John Steiert, testified Marzen admitted in his presence during a confrontation at Doe's apartment and at a later meeting with Marzen and Doe at Marzen's law office to a sexual relationship with Doe. Another witness, Amanda Knapp, testified she observed Marzen and Doe emerge from a bedroom in the house where Doe was living following her release from the hospitalization commitment. The house was owned by Amanda's mother, Connie Knapp, who was very close to Doe. Amanda had stopped by the house unannounced when she observed Doe and Marzen walking out of the bedroom. The situation was momentarily uncomfortable for Amanda, and Doe hastily offered a reason for her presence in the bedroom with Marzen. Amanda believed the clumsy explanation was fabricated. Additionally, Amanda testified she drove Doe to Marzen's office one evening and dropped her off at the building.

Another witness, Connie Knapp, testified Doe mentioned to her that she had gone for a ride with Marzen in his car on one occasion to a storage unit in Osage. Judith O'Donohoe, a lawyer, testified Doe told her about her sexual relationship with Marzen. This revelation occurred during a conference at her office in February of 2006, long before Marzen filed papers to run for Floyd County Attorney in August 2006. This testimony was given in response to a claim by Marzen that Doe made up the claim of sexual misconduct to hinder his campaign for county attorney.

Marzen denied the existence of any sexual relationship at any time with Doe. He testified Doe was never at his house. However, he acknowledged he had been at the house where Doe was staying on multiple occasions, but only for business purposes. Marzen denied Amanda confronted them emerging from a bedroom. Instead, he testified he was in the living room of the house with Doe when Amanda arrived. He also denied making any admissions of a sexual relationship to Steiert. He further disputed the accuracy of Doe's description of the house, claiming her drawing was not even close to depicting the actual layout of his residence. With respect to the physical description of his body, Marzen claimed he had more than ten moles on his back, which Doe failed to mention, as well as a mole on the lower portion of his abdomen that Doe should have mentioned if her descriptions of their sex acts were truthful.

Marzen denied the presence of a flap of loose skin on the bottom portion of his buttocks. He did, however, acknowledge he weighed 325 pounds when he graduated from high school and lost between 125 and 150 pounds since that time. He also acknowledged he has loose skin around his waist and inside his arms. Marzen agreed he had a large

mole on his back as described by Doe, but believed she could have seen the mole when he was at the swimming pool in Charles City during the summer of 2006. Marzen recalled that Doe and her son were at the pool on one occasion when he was swimming at the pool. He also said he commonly removed his shirt when he mowed his lawn. Marzen did not deny he was at the storage facility with Doe, but denied any sexual activity occurred. He said they drove to the facility in separate vehicles.

In addition to his testimony, Marzen offered testimony from a number of witnesses. Rod Mulcahy, a lawyer in Marzen's former law office, testified the attorneys and staff at the office would work on tax matters in the office in January until eight or nine o'clock in the evening. He felt it would be difficult for Marzen to have had sex in his office during this time without being noticed.

Marzen also offered testimony from a number of witnesses designed to show Doe had a propensity to lie or exaggerate. In particular, Marzen offered the testimony of David Skilton, an attorney, who represented Doe's mother in an action brought by Doe to obtain an injunction against her mother. Skilton said Doe testified at the hearing on the injunction that "no one had ever hurt her or . . . done anything to her in a sexual way except one time" in an incident with her parole officer. Skilton also said Doe testified that Marzen "didn't do a good job" in his representation of her.

Marzen offered testimony from John Farrell, a probation officer formerly assigned to Doe. Doe had sued Farrell for sexual misconduct, intentional infliction of emotional distress, assault, and false imprisonment. Although Farrell denied any sexual harassment or other such conduct, he settled the lawsuit for $5000. Marzen argues the Farrell lawsuit establishes a motive for Doe to concoct a similar claim

against him. He believes Doe merely wanted to avoid paying him for his legal services and, eventually, wanted to file a lawsuit against him to force a settlement.

The parties introduced a number of exhibits. In particular, the exhibits showed that a comforter in a bedroom of the house where Doe was residing and a coat allegedly worn by Doe during the car-sex episode were tested for DNA by the Iowa Department of Criminal Investigation. The test results were negative. The exhibits also contained a report from a doctor who examined Marzen's back and buttocks for purposes of this proceeding. However, the report did not indicate the doctor understood that one of the purposes of the examination was to confirm or deny the presence of visible additional layers of tissue or fat, medically referred to as panniculi, on his lower buttocks. The report documented only that Marzen's buttocks and perineum appeared "normal," without a specific statement affirming or denying the presence of loose folds of skin. The medical examination indicated Marzen did have a mole in the middle of his back that was recently surgically removed.

3. *Ethical violation.* The critical factual issues presented in the sexual-misconduct charge are whether the evidence adduced before the commission supported a prohibited sexual relationship by a convincing preponderance of the evidence and, if so, the degree of aggravation associated with the ethical violation. We readily recognize only two people know the truth of the sexual-misconduct allegations at the center of this case, and we can only perform our role in the course of our de novo review of the record to sort through the evidence to piece together our view of the facts by using our common principles of fact-finding. In making our factual determinations, our task is complicated by the many complexities and inconsistencies in the evidence as well as

gaps in the record. Further, there were credibility problems for both Doe and Marzen. The commission noted Doe had a history of accusation of wrongdoing against persons in authority, had her credibility questioned by a district court judge, and had a history of lying to authorities. On the other hand, the commission noted Marzen had illusions of grandeur and had demonstrated an ability to stretch the truth to fit his needs.

Upon our de novo review of the record, we basically agree with the assessments of the commission with respect to the credibility of Marzen and Doe. The issue, however, is not whether Doe or Marzen always tell the truth. The issue is whether one of them was truthful regarding the issues presented in this case. *See McGrath*, 713 N.W.2d at 701. In the end, we can only find a violation of sexual misconduct if we find by a convincing preponderance of the evidence that Marzen and Doe engaged in sexual relations during the time Marzen represented Doe. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Evans*, 537 N.W.2d 783, 784 (Iowa 1995) (burden of proof). We readily understand the commission had the advantage of hearing and seeing the witnesses who testified at the hearing and made a finding that the board failed to prove sexual relations occurred between Marzen and Doe. We give this finding weight, but also recognize the commission was not unanimous in its finding. We also consider the view of the dissenting member of the commission, who was convinced Marzen and Doe engaged in sexual relations.

While the testimony by Doe and Marzen over the fighting issue of sexual relations was wildly conflicting, some evidence tended to both corroborate and discredit the testimony of both persons, while other evidence surfaced to expose Marzen generally as a person who was quick to deny even testimony and evidence against him that was otherwise credible in light of the other evidence presented and common experience.

For example, contrary to the assertion by Marzen, the sketch drawn by Doe of the layout of Marzen's home, while not to scale, correctly identified the positions of the living room, dining room, kitchen, bathroom, hallways, and bedrooms. It was the type of sketch to be expected from a person with limited familiarity with the house. More importantly, it was the type of sketch expected to be drawn by a person who had in fact been in the house. Marzen's criticism of the sketch at the hearing was not only dubious and overdone, but suspicious and unreasonable.

Similarly, Marzen flatly denied Doe's description of his buttocks. Yet, he failed to further counter the claim of panniculi on his buttocks with equally sharp and decisive evidence to verify his denial. The claim involved an unusual but distinctive condition of a private part of a person's body, and Marzen had the ability to disprove the existence of the condition and discredit Doe. The medical examination was such an opportunity, but the written report by the doctor who examined Marzen failed to either confirm or deny the presence of panniculi on his lower buttocks. Moreover, the claim of panniculi on Marzen's buttocks was consistent with the presence of panniculi he admitted was present on other areas of his body. The claim itself was unusual enough that a person accusing another of sexual impropriety would not likely conceive of and fabricate the condition as an identifying mark to falsely frame an accused, especially when the condition would appear to be easily disproven by the accused if it did not exist.

We also find Doe's testimony regarding the location of a mole on Marzen's back, which was surgically removed after the alleged incidents, was significant. While it is possible Doe could have observed the mole under circumstances other than as testified by Doe, her testimony about

the mole was another piece of evidence to support her version of their relationship. Furthermore, the testimony of Amanda that Doe and Marzen emerged from a bedroom under what Amanda thought were suspicious circumstances, while of limited value in and of itself, added to the credibility of Doe's testimony. Although not a disinterested witness, Steiert testified in clear and unambiguous terms that Marzen had twice admitted to him the existence of a sexual relationship with Doe.

Finally, we consider the issue of motivation. We credit the testimony of O'Donohoe that Doe presented at her office on February 27, 2006, and reported the sexual relationship. At that point in time, there was no suggestion Marzen would press Doe to collect his fee, which would have given Doe motivation to make a false claim against Marzen. Further, there was no political motivation on the part of O'Donohoe or Doe to fabricate the existence of a sexual relationship. Finally, there was no reason to think at that point in time that the disclosure would advance Doe in the custody dispute with her former husband. Indeed, as events ultimately unfolded, the district court used Doe's relationship with Marzen as a factor in granting a modification of child custody adverse to Doe.

It is conceivable that Doe's need for attention could have motivated her to make a false claim. Yet, there is no doubt Marzen suddenly started to give considerable attention to Doe following the involuntary commitment hearing, both in and out of his office. Further, while Doe conceivably could have been trying to set Marzen up for a bogus claim, she did not file a lawsuit against him contemporaneously with her original disclosure to O'Donohoe. She filed her action only after her relationship with Marzen had been exposed publicly in the media eight months after her meeting with O'Donohoe. Further, there was no

evidence that Marzen, as a young, inexperienced lawyer in a small town, was a good target for a financial windfall.

On the other hand, Marzen's denials beginning in September 2006 were suspect. He had much at stake, including his law license and his legal career. Thus, he had substantial motivation to deny the existence of a sexual relationship. His evidence in support of this denial of sexual relations was not nearly as credible as the evidence by Doe to support her testimony.

On the whole, we find Doe's testimony, coupled with the corroborating evidence, is sufficient for us to conclude the board demonstrated by a convincing preponderance of the evidence that Doe and Marzen engaged in a sexual relationship. We also conclude the sexual relationship occurred during the time Marzen represented Doe on several legal matters.

4. *Aggravating circumstances.* We next consider whether the board proved any aggravating circumstances. We begin by considering whether the board proved by a convincing preponderance of evidence that Marzen engaged in a sex-for-fees arrangement with Doe. Unlike her testimony regarding the sex acts, Doe's testimony on this point was vague. She contended there was no explicit discussion of sex for fees, but that it was "like, you help me, I'll help you." She did not specifically attribute this statement to Marzen, and it may have simply reflected her state of mind. Further, while it is plausible her phraseology amounted to a sex-for-fees offer, it is also plausible that it was simply an expression that a consensual sexual relationship would be satisfying to both parties.

The documentary trail on the sex-for-fees issue did not present convincing evidence in support of the board's position. Marzen appeared to have contemporaneously recorded his time and ultimately presented

bills to Doe or to her significant other. He appeared to exercise billing judgment in reducing his first invoice on private pay matters. Once he presented an invoice, he further marked down the invoice "per agreement," but this did not establish sex for fees but only an agreement to reduce the bill. On this issue, we also believe Doe's tendency to exaggerate is pertinent. It may be that she thought it necessary to engage in sex to keep Marzen adequately engaged in her legal affairs. It may also be true that she thought she would get a reduction in fees if she did so. These beliefs, however, do not establish a sex-for-fees arrangement. On the record presented, we do not find convincing evidence of a sex-for-fees agreement.

The absence of convincing proof of a sex-for-fees agreement does not end our inquiry into the presence of other aggravating circumstances. In considering the presence of other aggravating circumstances in this case, it is important to keep in mind Doe had just been discharged from an involuntary mental health commitment at the time of the sexual relationship. She had no money and no place to live. She had a difficult relationship with her mother that was reaching a boiling point. Her continued custody of her child was also in question. These circumstances presented unique challenges to the maintenance of her sobriety. Thus, even if the evidence failed to establish a sex-for-fees arrangement, the evidence did show Marzen, as an attorney, took advantage of a client who was extremely vulnerable. Such conduct constitutes an aggravating factor to support a more severe sanction. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Steffes*, 588 N.W.2d 121, 125 (Iowa 1999) (two-year suspension for egregious sexual exploitation of a very vulnerable client).

**B. Public Disclosure of Confidential Information.**

1. *Background facts and legal framework.* On October 27, 2006, Marzen was interviewed by KIMT News Channel 3 of Mason City. Marzen was asked to comment on Doe's allegations and the ongoing disciplinary investigation. Marzen responded, "[Doe] stated she had been in a situation with her probation officer. I didn't find out until later that it was sexual misconduct." Marzen further told print reporters that Doe ended his representation when she could not pay her bill. The board alleged this behavior violated Iowa Rule of Professional Conduct 32:1.6(a). *See* Iowa R. Prof'l Conduct 32:1.6(a) ("A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure is permitted by paragraph (b) or required by paragraph (c).").

In contrast to Count I, resolution of Count III presents a legal question. Factually, there is no doubt that Marzen publicly disclosed Doe's prior history with and litigation involving her former probation officer. Further, there is no factual question that Marzen learned this information through a confidential conversation with his client.[2] Doe also testified that she never consented to Marzen's disclosure. The question thus presented is whether an attorney violates the rules of confidentiality by disclosing information learned through client confidences when that information is also available in the public forum.

---

[2]In his brief, Marzen suggests that the information he released may have come from public sources. While it is clear that such information may have been publicly available, Marzen's own testimony recognizes that he learned of this information through his conversations with Doe. Prior to representing Doe, Marzen only had a vague notion that there was an issue with one of the probation officers. It was through his representation of Doe that he discovered the specifics.

2. *Ethical violation.* While Marzen's attempt to evade application of the rule of confidentiality is novel, it cannot be sustained. Although Iowa has no case law directly on point, the Kansas Supreme Court recently dealt with a similar scenario. In *In re Bryan*, 61 P.3d 641, 645 (Kan. 2003), an attorney disclosed to a store manager and to a loss-prevention manager that his former client "has a history of making false claims." The attorney defended his disclosure, arguing "that information previously disclosed to the general public in court pleadings does not retain any confidentiality that would prohibit subsequent disclosure of that information." *Bryan*, 61 P.3d at 656. The Kansas Supreme Court rejected the argument. *Id.* The court noted that the ethical requirement of confidentiality is broader than the narrowly interpreted attorney-client privilege. *Id.* Thus, the rule of confidentiality must apply to *all* communication between the lawyer and client, even if the information is otherwise available.

This result is consistent with the approach taken in other jurisdictions. *See Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 572–73 (2d Cir. 1973) ("[T]he client's privilege in confidential information disclosed to his attorney 'is not nullified by the fact that the circumstances to be disclosed are part of a public record, or that there are other available sources for such information, or by the fact that the lawyer received the same information from other sources.'" (quoting Henry S. Drinker, *Legal Ethics* 135 (1953))); *In re Rules of Prof'l Conduct & Insurer Imposed Billing Rules & Procedures*, 2 P.3d 806, 822 (Mont. 2000) (holding rule of confidentiality "extends to *all* communications between insureds and defense counsel and that this rule is therefore broader in both scope and protection than the attorney-client privilege and the work product doctrine"); *In re Advisory Opinion No. 544*, 511

A.2d 609, 612 (N.J. 1986) (concluding "this Rule [of Confidentiality] expands the scope of protected information to include all information relating to the representation, regardless of the source or whether the client has requested it be kept confidential or whether disclosure of the information would be embarrassing or detrimental to the client").

This result is also consistent with the overall structure of our rules of confidentiality.  For instance, our rules prohibit an attorney from profiting on information obtained through client confidences, without an explicit exception for information that is otherwise publicly available. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Miller,* 568 N.W.2d 665, 667 (Iowa 1997).  The reason for this omission is clear—the sanctity of the lawyer-client relationship is necessary to ensure free and unrestrained communication without fear of betrayal.  On this issue of first impression, therefore, we hold that the rule of confidentiality is breached when an attorney discloses information learned through the attorney-client relationship even if that information is otherwise publicly available.

Marzen argues that, even if his disclosures constituted a breach of confidentiality, that breach was excused by rule 32:1.6(b)(5).  That rule provides:

> A lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary:  . . . to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client[.]

Iowa R. Prof'l Conduct 32:1.6(b)(5).  Comment ten to the rule makes clear that the ability to defend arises in criminal and civil proceedings,

including disciplinary actions. *Id.* 32:1.6 cmt. 10. However, it is not clear from Marzen's statements to the media that he was attempting to mount a defense; rather, it would appear that he was attempting to defame Doe. *See Bryan*, 61 P.3d at 658 (concluding disclosure had a negative purpose). The ability to defend, moreover, is not absolute. A lawyer can reveal confidential client information only in the *appropriate forum* and only to the *extent* necessary to offer protection. While certainly the revelation of Doe's confidential information to the local media was necessary to defend Marzen's bid for county attorney, it was not necessary to defend him against the allegations of this disciplinary proceeding. We have considered all of Marzen's claims and find his conduct violated rule 32:1.6(a).

**C. Sanction.** "There is no standard discipline for a particular type of attorney misconduct . . . ." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kadenge*, 706 N.W.2d 403, 410 (Iowa 2005). "[W]e are obliged to tailor disciplinary sanctions to the specific facts and circumstances of each individual case." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Erbes*, 604 N.W.2d 656, 659 (Iowa 2000). Nevertheless, this court tries to achieve a certain level of consistency. *Kadenge*, 706 N.W.2d at 410. In determining the appropriate sanction, we consider " 'the nature of the violations, protection of the public, deterrence of similar misconduct by others, the lawyer's fitness to practice, and [the court's] duty to uphold the integrity of the profession in the eyes of the public.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Iversen*, 723 N.W.2d 806, 810 (Iowa 2006) (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Honken*, 688 N.W.2d 812, 820 (Iowa 2004)). Relevant aggravating and mitigating circumstances will also be considered. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 729 N.W.2d 437, 443 (Iowa 2007).

Although the facts and circumstances of this case are unique, the ethical violation is not unprecedented. Our ethics rules are clear, and our cases have consistently and explicitly condemned sexual relationships between an attorney and a client. The rationale is equally clear:

> "The unequal balance of power in the attorney-client relationship, rooted in the attorney's special skill and knowledge on the one hand and the client's potential vulnerability on the other, may enable the lawyer to dominate and take unfair advantage. When a lawyer uses this power to initiate a sexual relationship with a client, actual harm to the client, and the client's interest, may result. Such overreaching by an attorney is harmful in any legal representation but presents an even greater danger to the client seeking advice in times of personal crisis . . . ."

*Furlong*, 625 N.W.2d at 714 (quoting Iowa Code of Prof'l Responsibility for Lawyers EC 5-25).[3] Consequently, a violation of the governing ethical rule is a serious transgression. Clients figuratively, if not literally, can trust lawyers with their lives, and they have the right to expect, as we demand, the lawyer will treat that trust with care derived from those noble traditions of service, integrity, and commitment found at the heart of the legal profession. *See Comm. on Prof'l Ethics & Conduct v. Hill*, 436 N.W.2d 57, 59 (Iowa 1989) (*Hill I*).

Our past cases reveal a broad range of discipline for attorneys who engage in sexual relations with a client. This range is between a public reprimand and a lengthy period of suspension from the practice of law. The wide range of discipline largely results from the presence or absence of circumstances in addition to the sexual relations that make the overall misconduct more serious. For example, in *McGrath*, we suspended an

---

[3]The same explanation for the rule prohibiting sexual conduct between attorneys and clients can now be found in the Iowa Rules of Professional Conduct. *See* Iowa R. Prof'l Conduct 32:1.8(j) & cmt. 17.

attorney for three years when the sexual relations involved a client in a case concerning matters of paramount personal importance to the client, included a sex-for-fees arrangement, and the attorney had solicited sex from another client. 713 N.W.2d at 703. On the other hand, we publicly reprimanded a lawyer who had sexual contact with a client during visits with the client in the penitentiary. *Comm. on Prof'l Ethics & Conduct v. Durham*, 279 N.W.2d 280, 285–86 (Iowa 1979). *See generally Iowa Supreme Ct. Att'y Disciplinary Bd. v. Morrison*, 727 N.W.2d 115, 120 (Iowa 2007) (suspension from practice for three months where attorney had sexual relationship with dissolution client and had been previously admonished for the same conduct with a different client); *Furlong*, 625 N.W.2d at 713–14 (eighteen-month suspension for carrying on a sexual relationship with one client, attempting to dissuade her from complaining to disciplinary authorities, and sexually harassing another client); *Hill II*, 540 N.W.2d at 44–45 (self-described "hands-on" counselor suspended and reprimanded in two previous disciplinary proceedings was suspended for twelve months for making unwelcome sexual advances toward client in child-custody case); *Hill I*, 436 N.W.2d at 58–59 (three-month suspension for sexual relationship with client in divorce and custody case).

Our prior case containing facts most similar to the facts of this case is *Hill I*. In *Hill I*, the attorney had sexual intercourse on one occasion with a client who had sought his representation to obtain a divorce involving custody of children. 436 N.W.2d at 59. At the time, the client was unemployed, drug-addicted, and emotionally unstable. *Id.* at 58. We suspended the attorney from the practice of law for a period of three months. *Id.* at 59. The facts of this case are also similar to

*Morrison,* in which we also imposed a three-month suspension. 727 N.W.2d at 120.

The discipline imposed for violating the confidences of a client also varies with the particular facts and circumstances. We have not had the occasion in our prior cases to impose discipline based solely on the disclosure of confidential client information, but have only imposed discipline in conjunction with other misconduct. Generally, however, discipline for the violation of client confidence would appear to warrant a modest period of suspension between sixty days and three months when combined with aggravating circumstances. *Miller,* 568 N.W.2d at 667 (sixty-day suspension imposed on attorney revealing confidential information of client for financial reasons and for attempting to demand withdrawal of ethics complaint); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sikma,* 533 N.W.2d 532, 537–38 (Iowa 1995) (three-month suspension for entering into a business transaction with a client involving misuse of client's confidential information). A violation would likely result in something less than a suspension without any aggravating circumstances. Nevertheless, disclosure or misuse of a client's confidential information is an especially problematic violation since

> [a] fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, the lawyer must not reveal information relating to the representation. . . . This contributes to the trust that is the hallmark of the client-lawyer relationship.

Iowa R. Prof'l Conduct 32:1.6 cmt. 2.

Because one of the purposes of the rules at issue in this case is to prevent exploitation of vulnerable clients, a violation is even more egregious when the particular client is mentally or emotionally unstable.

*See McGrath*, 713 N.W.2d at 703 ("Preying upon this vulnerability [involving custody of and visitation with the clients' children], the respondent manipulated these women . . . for his own sexual gratification."). In this case, Marzen's sexual relationship with Doe was particularly offensive to the notions of trustworthiness and professionalism built into the foundation of the rule because Marzen met Doe as a court-appointed attorney for her involuntary mental health commitment proceeding. In addition to her mental instability, Marzen knew Doe was involved in family conflict, including a child-custody dispute. In such circumstances of "paramount personal importance," the professional and confidential relationship between attorney and client is critical and a betrayal of the relationship must be sanctioned with that betrayal in mind. *Id.* While many, if not most, people seek out lawyers for help in matters of personal importance and may, consequently, be vulnerable, the mental health condition of Doe at the time the sexual relationship began is an aggravating circumstance to consider in the imposition of discipline.

Considering all the circumstances of this case, we conclude Marzen should be suspended from the practice of law for a period of six months. Although his sexual misconduct was not accompanied by the type of aggravating circumstances that has warranted a suspension for a lengthier period of time in other cases, he exploited the attorney-client relationship for his own sexual gratification to the detriment of his client and the profession. His egocentric attitude was also apparent in the public disclosure of confidential information. Yet, the most serious circumstance is he became sexually involved with his client at a time when she was most vulnerable and the trust of a lawyer was most needed and expected. This case goes well beyond the vulnerability that

is inherent in all attorney-client relationships. We conclude Marzen should be suspended from the practice of law in this state for a period of time not less than six months.

## IV. Conclusion.

We suspend Marzen's license to practice law with no possibility of reinstatement for a period not less than six months from the date of the filing of this opinion. This suspension applies to all facets of the practice of law pursuant to Iowa Court Rule 35.12(3). Upon application for reinstatement, Marzen shall have the burden to prove he has not practiced during the period of suspension and that he meets all the requirements of reinstatement provided in Iowa Court Rule 35.13. Costs of the action are taxed against Marzen in accordance with Iowa Court Rule 35.26(1).

**LICENSE SUSPENDED.**

All justices concur except Appel and Baker, JJ., who concur in part and dissent in part.

#08–1546, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Marzen*

**APPEL, Justice (concurring in part and dissenting in part).**

I respectfully dissent. The majority has presented a thorough and thoughtful review of this unattractive record. My difficulty arises from the fact that this court is necessarily conducting its review on a cold record where credibility determinations are necessary to the outcome of the case.

There are numerous troubling features in the record. For instance, in a proceeding brought by Doe against her mother, Doe testified under oath that there was no sexual misconduct in her relationship with Marzen. In addition, prior to the events which give rise to these proceedings, Doe obtained a financial settlement in connection with a charge of sexual misconduct involving a probation officer. These facts raise substantial credibility issues.

The board has the burden to prove the allegations of misconduct contained in the complaint by a convincing preponderance of the evidence. While this burden is lower than in a criminal prosecution, it is higher than the burden in most civil cases. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Evans,* 537 N.W.2d 783, 784 (Iowa 1995). A majority of the grievance commission members who heard the testimony determined that the board did not establish by a convincing preponderance of the evidence that Marzen engaged in sexual misconduct. On this record, I cannot conclude that the board met its heightened burden when the majority of the panel that actually heard the testimony came to a different conclusion.

I concur in the majority's analysis and conclusions regarding the disclosure of confidential information. I would find that a public reprimand is the appropriate sanction for this violation.

Baker, J., joins this concurrence in part and dissent in part.