# IN THE SUPREME COURT OF IOWA

No. 16–0625

Filed September 2, 2016

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**DEBORAH LYNN JOHNSON,**

Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission recommends the suspension of an attorney's license for thirty days for the violation of ethical rules. **LICENSE SUSPENDED.**

Tara M. van Brederode and Elizabeth Quinlan, Des Moines, for complainant.

David L. Brown of Hansen, McClintock & Riley, Des Moines, for respondent.

**MANSFIELD, Justice.**

An Iowa attorney engaged in an intimate relationship with one of her clients whom she was representing in several criminal and civil matters. When their relationship was discovered, the attorney self-reported her conduct and withdrew from representation of the client. The Iowa Supreme Court Attorney Disciplinary Board charged her with violations of Iowa Rules of Professional Conduct 32:1.8(j) (sexual relationship with a client) and 32:8.4(d) (conduct prejudicial to the administration of justice).

The parties reached a factual stipulation, agreed that the charged violations had occurred, and jointly proposed a thirty-day suspension as a sanction. The Grievance Commission considered the matter without a hearing and concluded the attorney had violated both rules. The commission recommended the attorney's license be suspended for thirty days. Upon our de novo review, we conclude that the attorney violated rule 32:1.8(j). We do not find a violation of rule 32:8.4(d). We agree with the commission's recommended sanction and suspend the attorney's license to practice law for thirty days.

## I. Background Facts and Proceedings.

Deborah Lynn Johnson is a solo practitioner in Altoona. She was admitted to the Massachusetts bar in 2001 and worked several years at an insurance defense firm in Boston. In 2004, she moved to Iowa and was admitted to the Iowa bar. Beginning in 2006, Johnson practiced at a firm in Newton. When that firm closed in 2010, Johnson opened her own law office. As a substantial part of her practice, Johnson represents indigent defendants by court appointment.

In May 2011, Johnson was appointed to represent John Doe in a child-in-need-of-assistance (CINA) matter. Doe was incarcerated at the

time. The matter was resolved later that year. Johnson next saw Doe at the Jasper County Courthouse in January 2013, after Doe had been released from prison. The two of them spoke briefly.

In the spring of 2013, Doe contacted Johnson with some guardianship questions. Soon thereafter, Johnson was appointed to represent Doe at his request in a criminal case. She was later appointed to represent him in approximately eight other criminal cases. Additionally, Johnson handled several civil matters for Doe pro bono.

In mid-January 2014, while Johnson was representing Doe on a number of these matters, she and Doe began to have an intimate relationship. Johnson and Doe are not married to one another. On March 4, while the relationship was still ongoing, Doe was arrested on federal charges. The case involved a confidential informant (CI), whose identity was known to Doe. While being held in the Polk County Jail, Doe asked Johnson to call Doe's former girlfriend and tell her to "stay away from [the CI]." Johnson did call the former girlfriend and passed along the message. She did not furnish any other details or answer any questions.

Doe's detention hearing on the federal charges took place on March 7. Johnson attended the hearing. During the hearing, the CI's name came up several times. A Federal Bureau of Investigation (FBI) agent testified that Doe was a member of a prison gang. Johnson had no prior knowledge of the gang or Doe's affiliation with it. That evening, Doe asked Johnson to contact a friend of his and give him the CI's name. Johnson spoke with the friend and told him that Doe was being held on a federal weapons charge in the Polk County Jail, but she did not pass along the name of the CI.

On March 6 and 9, Doe made monitored and recorded phone calls from the jail to Johnson. A few days later, FBI agents appeared at Johnson's law office. They asked about her relationship with Doe. Initially, Johnson said, "He is my client, we are friends, we go out to lunch and to [Alcoholics Anonymous] meetings." The FBI agents indicated they did not believe this statement. They told Johnson that jail personnel from the Polk County Jail had seen Johnson and Doe's interactions and listened to the recorded phone calls between them. Based on these observations, the jail officials had come to believe that Johnson and Doe maintained a personal relationship and had notified the FBI of their suspicions. The FBI agents told Johnson they were concerned that her relationship with Doe could threaten the safety of their CI. Johnson then admitted that her relationship with Doe was "more than attorney/client/friend." The agents told Johnson she would no longer be allowed unrestricted access to Doe at the jail. Johnson did not object. The agents also advised Johnson that the gang to which Doe allegedly belonged was very dangerous. Johnson agreed to inform the FBI if she learned anything that might jeopardize the safety of their CI. She later sent several text messages to the FBI about information she received.

On March 12, Johnson received a letter from the Jasper County Attorney's office asking her to withdraw from Doe's four pending criminal matters because of a "personal conflict." The letter also requested she abstain from representing Doe in any future criminal cases. Johnson responded by agreeing to withdraw after informing Doe. That same day she contacted Doe and told him she would be withdrawing from his pending criminal and civil matters. Johnson filed motions to withdraw in all six cases. Johnson arranged for another attorney to take over Doe's

civil cases pro bono. The court appointed new counsel for Doe in the criminal matters on March 24.

Johnson also telephoned an employee of the Board on March 13 or 14 and "self-reported that she had been involved in an intimate relationship with Doe while representing him in State court matters." On July 9, she sent a detailed letter to the Board. In the letter, she admitted that the relationship between her and Doe had become "personal in nature" in January 2014. "During that time, [she] continued to represent [Doe] on the four criminal actions . . . the two civil custody actions and the second civil petition for relief from domestic abuse." She acknowledged that she should have withdrawn and self-reported her conduct immediately upon the initiation of the intimate relationship with Doe. Her failure to do so "was wrong." She stated that her "professional relationship with [Doe], and the friendship and relationship that developed, became blurred and [she] made an error in judgment."

Johnson began seeing a therapist in late March. She was prescribed anti-depressants. Around that same time, Johnson notified a district court judge that she wanted to be temporarily removed from the list of attorneys available for court appointments. On June 26, when a long-term client requested Johnson, she advised the court that she was willing to accept court appointments again.

On July 8, 2015, the Board filed a complaint against Johnson alleging that she had engaged in sexual relations with a client in violation of Iowa Rule of Professional Conduct 32:1.8(j) and conduct that was prejudicial to the administration of justice in violation of rule 32:8.4(d). Johnson answered and initially denied she had engaged in sexual relations with Doe. Later, the Board and Johnson submitted a joint stipulation pursuant to Iowa Court Rule 35.9, waiving the required

formal hearing. According to the stipulation, "Johnson was representing Doe . . . pro bono when they began an intimate relationship in mid-January 2014." The parties agreed that Johnson had violated rules 32:1.8(j) and 32:8.4(d). As a sanction, the parties jointly proposed a thirty-day suspension.

The matter was submitted to the commission for its consideration without a hearing on the basis of the stipulation. The parties did not file briefs. On April 11, 2016, the commission issued its findings and recommendation. The commission found that both violations were factually supported and recommended that Johnson's license be suspended for thirty days.

## II. Standard of Review.

Our review of attorney disciplinary proceedings is de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Blessum*, 861 N.W.2d 575, 582 (Iowa 2015). We respectfully consider the findings and recommendations of the commission but are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Rhinehart*, 827 N.W.2d 169, 171 (Iowa 2013). The Board must prove its allegations of attorney misconduct by a convincing preponderance of the evidence. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Moothart*, 860 N.W.2d 598, 603 (Iowa 2015). "This standard is more demanding than proof by preponderance of the evidence, but less demanding than proof beyond a reasonable doubt." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ouderkirk*, 845 N.W.2d 31, 33 (Iowa 2014).

When the parties enter into a stipulation, as here, they are bound by the stipulated facts, which we interpret with reference to their subject matter and in light of the surrounding circumstances and the whole record. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Haskovec*, 869 N.W.2d

554, 557 (Iowa 2015). We are not bound by stipulations as to ethical violations or the appropriate sanction. *Id.*

### III. Ethical Violations.

**A. Rule 32:1.8: Sexual Relations with a Client.** Iowa Rule of Professional Conduct 32:1.8(j) provides, "A lawyer shall not have sexual relations with a client, or a representative of a client, unless the person is the spouse of the lawyer or the sexual relationship predates the initiation of the client–lawyer relationship." The rule forbids such relationships even if the relationship is consensual. *See* Iowa R. Prof'l Conduct 32:1.8 cmt. 17 ("[T]his rule prohibits the lawyer from having sexual relations with a client regardless of whether the relationship is consensual and regardless of the absence of prejudice to the client.").

This prohibition exists for several reasons. For one thing, as the rule comment explains, "such a relationship presents a significant danger that, because of the lawyer's emotional involvement, the lawyer will be unable to represent the client without impairment of the exercise of independent professional judgment." *Id.* Our caselaw deems "a conflict between the client's interest and the attorney's personal interests [to be] inherent in such situations." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Monroe*, 784 N.W.2d 784, 788–89 (Iowa 2010).

Also, the comment notes that a sexual relationship between client and attorney "is almost always unequal" and "can involve unfair exploitation of the lawyer's fiduciary role." Iowa R. Prof'l Conduct 32:1.8 cmt. 17. We have said that "the professional relationship renders it impossible for the vulnerable layperson to be considered 'consenting' " to the sexual relationship. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Marzen*, 779 N.W.2d 757, 760 (Iowa 2010) (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Furlong*, 625 N.W.2d 711, 714 (Iowa 2001));

*see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Morrison*, 727 N.W.2d 115, 118 (Iowa 2007) (discussing the prior version of the rule in the Code of Professional Responsibility and delineating four separate reasons for it).

When considering alleged violations of this rule and its precursor, we have repeatedly stated that "[p]rofessional responsibility involves many gray areas, but sexual relationships between attorney and client is not one of these. Such conduct is clearly improper." *Morrison*, 727 N.W.2d at 118 (quoting *Furlong*, 625 N.W.2d at 714); *see also Monroe*, 784 N.W.2d at 790 ("There is no gray area with respect to the prohibition of such conduct, no nuance subject to differing interpretations."); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGrath*, 713 N.W.2d 682, 703 (Iowa 2006).

Johnson admits she violated rule 32:1.8(j). The Board and Johnson stipulated to the fact that Johnson and Doe began an intimate relationship in January 2014, well after Johnson commenced her representation of Doe in several matters. This relationship does not meet either exception to the rule—i.e., it did not predate the initiation of the client–lawyer relationship, and Doe is not Johnson's spouse. *See* Iowa R. Prof'l Conduct 32:1.8(j). Accordingly, we find that Johnson violated rule 32:1.8(j).

**B. Rule 32:8.4(d): Conduct Prejudicial to the Administration of Justice.** Next, we must address whether Johnson engaged in conduct that violated Iowa Rule of Professional Conduct 32:8.4(d). Under this rule, "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." Iowa R. Prof'l Conduct 32:8.4(d). In determining whether a violation of this rule occurred, "[t]he dispositive inquiry is whether 'the attorney's act[s]

hampered the efficient and proper operation of the courts or of ancillary systems upon which the courts rely.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kingery,* 871 N.W.2d 109, 121 (Iowa 2015) (second alteration in original) (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Steffes,* 588 N.W.2d 121, 123 (Iowa 1999)). A violation of rule 32:1.8(j) does not result in a per se violation of rule 32:8.4(d). *See Monroe,* 784 N.W.2d at 789.

Our decisions "have consistently held that an attorney representing a client violates rule 32:8.4(d) when his misconduct results in additional court proceedings or causes court proceedings to be delayed or dismissed." *Rhinehart,* 827 N.W.2d at 180; *see Iowa Supreme Ct. Att'y Disciplinary Bd. v. Silich,* 872 N.W.2d 181, 192 (Iowa 2015) ("Silich's omissions and poor communication with his clients necessitated three additional court hearings."); *Kingery,* 871 N.W.2d at 121 ("Kingery's neglect of her criminal matters caused numerous delays in the judicial process . . . ."); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Baldwin,* 857 N.W.2d 195, 212–13 (Iowa 2014) (noting that "wasting court resources" was prejudicial to the administration of justice); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGinness,* 844 N.W.2d 456, 463 (Iowa 2014) ("McGinness caused the district court to schedule a completely unnecessary hearing about a collateral matter completely unrelated to the merits of the underlying lawsuit. . . . [H]e plainly impaired the efficient operation of the court system and caused a waste of judicial resources."); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dolezal,* 841 N.W.2d 114, 124 (Iowa 2013) ("Dolezal's refusal to turn over the Carter file necessitated multiple hearings between 2011 and 2013."); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kennedy,* 837 N.W.2d 659, 673 (Iowa 2013) ("Kennedy's actions (or more accurately inactions) led to

protracted and otherwise unnecessary proceedings . . . ."); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stowers,* 823 N.W.2d 1, 15 (Iowa 2012) ("Stowers's emails violated the protective order and triggered a series of unnecessary court proceedings, including rulings by the district court, court of appeals, and this court.  This constituted conduct prejudicial to the administration of justice." (Citation omitted.)).

The commission's finding of a rule 32:8.4(d) violation centers on Johnson's withdrawal in March 2014 from her pending Doe cases and the court's appointment of new counsel.  Yet the record indicates that the substitutions of counsel went quickly; Johnson herself recruited pro bono replacement counsel in the civil matters.  The record does not disclose that any prior hearings had to be redone because of the withdrawals.  Moreover, had Johnson avoided a violation of rule 32:1.8(j) by withdrawing from all representation of Doe before having an intimate relationship with him, the same court-supervised withdrawals would have been required.  Thus, while Johnson's relationship with her client involved misconduct, we cannot agree that the misconduct in and of itself necessitated additional court proceedings.  Identical withdrawals would have been needed if Johnson had complied with rule 32:1.8(j).[1]

---

[1]The commission reasoned, "Had Respondent not engaged in an intimate relationship with Doe, she would not have had to withdraw from his criminal cases and the district court would not have had to appoint new counsel."  This is true, but an intimate relationship is not a violation by itself:

> [I]t should be clear that there is nothing in Rule 1.8(j) that seeks to prevent adults from commencing a sexual relationship at any time of their choosing.  The point is instead that if a client–lawyer relationship already existed at the time that the sexual relationship began, the lawyer would be required to withdraw from the representation.

1 Geoffrey C. Hazard, Jr. et al., *The Law of Lawyering* § 13.37, at 13-91 fn.76 (4th ed. 2015).  Rather, the violation consists of "sexual relations *with a client.*"  Iowa R. Prof'l Conduct 32:1.8(j) (emphasis added).

As previously noted, we rejected in *Monroe* "the proposition that a sexual relationship between client and attorney is a per se violation of rule 32:8.4(d)." 784 N.W.2d at 788. We did add that "a client–attorney relationship compromised by a concurrent intimate relationship could prompt acts or omissions by the attorney or client that would impede the proper functioning of the court system for purposes of the client's case." *Id.* at 789. Still, based on the record before us, Johnson's compromised attorney–client relationship did not cause any court delays. Instead, the alleged rule 32:8.4(d) violation was based only on Johnson's appropriate and necessary attempts to remedy her rule 32:1.8(j) violation. That is not enough. A different situation might well be presented if Johnson had not withdrawn promptly and with minimal disruption or if Johnson's continuing representation of Doe while in an intimate relationship with him had resulted in a wasteful duplication of court proceedings to a significant degree.

For these reasons, we conclude that Johnson did not violate rule 32:8.4(d).

### IV. Sanction.

Having found that Johnson violated rule 32:1.8(j), we must now determine the appropriate sanction. "There is no standard sanction for a particular type of misconduct, and though prior cases can be instructive, we ultimately determine an appropriate sanction based on the particular circumstances of each case." *Blessum*, 861 N.W.2d at 591 (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Morris*, 847 N.W.2d 428, 435 (Iowa 2014)). We take into account

> [t]he nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of

the reputation of the bar as a whole, and any aggravating or mitigating circumstances.

*Moothart*, 860 N.W.2d at 615 (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Van Ginkel*, 809 N.W.2d 96, 108 (Iowa 2012)). We respectfully consider the commission's recommended sanction, but we remain free to impose a greater or lesser sanction. *McGinness*, 844 N.W.2d at 463–64.

"Our past cases reveal a broad range of discipline for attorneys who engage in sexual relations with a client. This range is between a public reprimand and a lengthy period of suspension from the practice of law." *Marzen*, 779 N.W.2d at 767. The presence of aggravating circumstances in a case will merit the imposition of a more substantial sanction. *See id.*

We have levied more severe sanctions in cases involving multiple clients or clients who were particularly vulnerable. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Bowles*, 794 N.W.2d 1, 3–4, 7–8 (Iowa 2011) (imposing a suspension of at least eighteen months on an attorney who had engaged in a sexual relationship with a client who had recently been discharged from a mental health facility and relied on a false affidavit in the disciplinary proceedings); *Marzen*, 779 N.W.2d at 768–69 (imposing a suspension of at least six months on an attorney who had a sexual relationship with a vulnerable client he represented in an involuntary commitment proceeding); *Furlong*, 625 N.W.2d at 712, 714 (suspending an attorney's license for at least eighteen months where the attorney's sexual advances were "uninvited and unwelcome" and he had sexually harassed two other clients); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hill*, 540 N.W.2d 43, 45 (Iowa 1995) (suspending for no less than twelve months the license of an attorney who made "unwelcome sexual advances" towards a client and who had previously been

disciplined with a three-month suspension for having sexual relations with a client).[2]

In a recent case, we suspended an attorney for a minimum of thirty months when his "actions show[ed] a specific pattern of conduct with respect to a number of victims." *Moothart,* 860 N.W.2d at 617. The attorney not only had had sexual relations with two clients; he had sexually harassed five women including four clients. *Id.* at 607–14, 616 ("The pattern and extent of Moothart's conduct is an unprecedented set of facts . . . ."). We also noted that the client–victims were all in "difficult, stressful situations," rendering them particularly vulnerable. *Id.* at 617.

Other aggravating circumstances that have led to the imposition of greater sanctions include sex-for-fees arrangements or sexual relationships accompanied by sexual harassment or physical abuse. *See Blessum,* 861 N.W.2d at 580, 595 (suspending for at least eighteen months the license of an attorney who had engaged in sexual relationship with client and then physically assaulted her, causing her physical and emotional harm); *McGrath,* 713 N.W.2d at 703–04 (imposing a suspension of at least three years on an attorney who established a sex-for-fees arrangement with a dissolution client and attempted to get another client to agree to the same arrangement).

---

[2]We first adopted an attorney disciplinary rule prohibiting sexual relations with a client in 1995 as part of the Iowa Code of Professional Responsibility for Lawyers. *See* Iowa Code of Prof'l Responsibility DR 5—101(B) & EC 5-25 (1995). In 2005, the Iowa Rules of Professional Conduct, including rule 32:1.8(j), went into effect and replaced the former Code. We therefore focus our attention on cases decided since 1995. Prior to that time, sexual relationships with clients were not directly prohibited under our rules. *Cf. Comm. on Prof'l Ethics & Conduct of Iowa State Bar Ass'n v. Durham,* 279 N.W.2d 280, 282, 285 (Iowa 1979) (examining whether an attorney's sexual contact with a client at prison amounted to conduct that reflected adversely on her fitness to practice law in violation of previous ethical rules).

We have imposed shorter suspensions of three months or less in cases when the conduct is less egregious. *See Morrison*, 727 N.W.2d at 118, 120 (suspending an attorney's license for a minimum of three months when attorney engaged in sexual relations with one client in dissolution proceedings). We agree with the commission that Johnson's violation "did not encompass the more egregious conduct that has accompanied" many of our past cases under rule 32:8.1(j) or its predecessor. *Morrison* had, as an aggravating factor, the fact that the attorney had previously been admonished for making a sexual advance toward another client. *Id.* at 120. In *Monroe*, which did not have this aggravating factor, we suspended an attorney's license for thirty days. 784 N.W.2d at 792.

The facts here are most comparable to those of *Monroe*. *See id.* at 791. Monroe had engaged in a relationship with his client that spanned several weeks, but "the misconduct appear[ed] to be an isolated occurrence, there being no evidence that Monroe had engaged in similar transgressions in the past." *Id.* Additionally, the commission observed in that case "that Monroe 'genuinely wanted to assist Ms. Doe, [but] lost sight of the ethical boundaries' governing his relationship with his client." *Id.* (alteration in original). The client did not harbor any ill will toward Monroe and testified at the hearing that the relationship was not coerced and she felt it was her decision to be in or out of the relationship. *Id.* at 787. As noted, we suspended Monroe's license for thirty days. *Id.* at 792.

In addition to reviewing our precedents, we also consider the relevant aggravating and mitigating circumstances. The fact that Johnson represented Doe in family and criminal matters is an aggravating circumstance. *See id.* at 790. "[C]lients are particularly

vulnerable under these circumstances, and the possibility of harm, especially when child custody matters are at stake, is high." *Id.* The same aggravating circumstance was present in *Monroe,* where the attorney was representing his client in a dissolution matter. *See id.* at 787.

As mitigating factors, we note that Johnson has no prior history of discipline and there have been no prior reports of similar or related misconduct on her part. *See Kingery,* 871 N.W.2d at 122 (considering an attorney's "unblemished disciplinary record" as a mitigating factor). Johnson did self-report her conduct and has expressed sincere remorse for her actions. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Bartley,* 860 N.W.2d 331, 339 (Iowa 2015) (noting that self-reporting misconduct "is normally a mitigating factor"); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Eslick,* 859 N.W.2d 198, 202 (Iowa 2015) ("[R]emorse and cooperation generally mitigate our sanction."). However, our consideration of Johnson's self-reporting must be tempered by the fact that Johnson self-reported only *after* the FBI confronted her with evidence of the sexual relationship, a relationship she initially denied. *See, e.g., Bartley,* 860 N.W.2d at 339 ("[M]itigation is lessened somewhat when the self-reporting is at least in part motivated by knowledge that the law firm would otherwise be reporting the violation."). Like Monroe, Johnson performs a significant amount of pro bono work. *See Monroe,* 784 N.W.2d at 791; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Boles,* 808 N.W.2d 431, 442 (Iowa 2012) ("Another significant mitigating factor in this case is Boles' admirable record of volunteer community service to local youth programs and his extensive pro bono practice."). Johnson also handles a substantial amount of reduced-fee work. Johnson submitted many letters into the record from former clients and fellow

attorneys uniformly praising her competence and her dedication to her clients.

Johnson has sought counseling to address certain mental health issues that may have contributed to her misconduct. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stoller*, 879 N.W.2d 199, 221 (Iowa 2016) ("[We] consistently recognize seeking mental health or other substance abuse treatment as a mitigating factor."). And although the facts of this case illustrate the *potential* dangers that can arise when a criminal defense attorney develops too close a relationship with an incarcerated client who is charged with serious crimes, there is no evidence here that anyone suffered harm as a result. *See Monroe*, 784 N.W.2d at 791 (noting the same mitigating circumstance); *cf. Blessum*, 861 N.W.2d at 595 (noting as an aggravating factor the physical and emotional harm that the client suffered).

After considering all of these points, we agree with the commission that the appropriate sanction is the suspension of Johnson's license to practice law for thirty days.

## V. Conclusion.

We suspend Johnson from the practice of law with no possibility of reinstatement for thirty days. This suspension applies to all facets of the practice of law. *See* Iowa Ct. R. 34.23(3). Johnson must notify her clients in compliance with Iowa Court Rule 34.24. The costs of this action are taxed to Johnson. *See id.* r. 36.24(1). Unless the Board objects, Johnson shall be automatically reinstated at the conclusion of the suspension period provided she has paid all costs. *See id.* r. 34.23(2).

**LICENSE SUSPENDED.**